INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 1547,
Appellant and Cross–Appellee,

v.

ALASKA UTILITY CONSTRUCTION,
INC., Appellee and Cross–
Appellant.

Nos. S–8207, S–8247.

Supreme Court of Alaska.

March 26, 1999.

Susan Orlansky, Jeffrey M. Feldman, Young & Feldman, Anchorage, for Appellant and Cross–Appellee.

Thomas P. Owens, Jr., Scott J. Nordstrand, Owens & Turner, P.C., Anchorage, for Appellee and Cross–Appellant.

Before: MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

MATTHEWS, Chief Justice.

### I. INTRODUCTION

This case arises from the picketing of Alaska Utility Construction, Inc. (AUC), a non-union contractor, by the International Brotherhood of Electrical Workers, Local 1547 (IBEW or Local 1547). The jury found that IBEW acted outrageously and awarded $425,000 in punitive damages to AUC. The trial court denied IBEW's motion for a new trial on punitive damages on the condition that AUC accept a remittitur of punitive damages to $212,500. AUC accepted the remittitur.

IBEW appeals the trial court's order denying a new trial on liability for punitive damages, and, in the alternative, contends that the remitted punitive damages award is excessive. AUC cross-appeals, arguing that the trial court erred in remitting the original punitive damages award. We affirm.

### II. FACTUAL AND PROCEDURAL BACKGROUND

#### A. Facts [1]

Aaron Downing formed Alaska Utility Construction, Inc., in 1986. AUC installed electric power poles and wiring for various utilities in Alaska. AUC's shareholders and employees were Downing's family members and close friends. Although Downing was a former member of the International Brotherhood of Electrical Workers and had previously been a union contractor, Downing chose to keep AUC non-union because he believed that he could bid projects more competitively.

When AUC was awarded several contracts to perform electric utility work in southcentral Alaska in the spring and summer of 1986, IBEW linemen were upset that the work had gone to Downing's non-unionized

---

1. The statement of facts reflects our standard of review. Since AUC prevailed below and is not the party moving for a new trial, we view the evidence in the light most favorable to AUC. We recount the facts accordingly. *See Richey v. Oen,* 824 P.2d 1371, 1375 (Alaska 1992).

company. Employees of Local 1547 met with Downing twice in the spring of 1986 to attempt to persuade Downing to hire union labor. Steve Shemel, the business representative for Local 1547's outside linemen, first met with Downing in April 1986. When Downing declined to sign an agreement with IBEW, Shemel intimated that Downing might have some problems at his impending project in Glennallen. As the Glennallen job got underway, Shemel and Jack Hull, the business manager for Local 1547, met with Downing once again to try to convince him to sign a union contract. Downing indicated that he would not sign an agreement unless the union gave him economic concessions. Shemel again suggested that Downing could have problems on his jobs.

AUC's first project began near Glennallen in late April or early May 1986. The contract required AUC to replace approximately two dozen power poles along the Richardson Highway. Toward the end of the three-week project, picketers appeared at the job site for two or three days. The picketers carried signs identifying themselves as IBEW members, and the picketing was sanctioned by Local 1547 and approved by its business manager Jack Hull. Shemel was present at the picketing and crossed the road to speak with AUC employees.

Although much of the picketing involved maintaining a presence and shouting epithets at the non-union employees, picketers also shouted obscene death threats along the lines of "we ought to kill all you mother-____s" and "we have to kill you all." Downing contacted Shemel and Hull about the picketing and threats. Shemel told Downing that he should sign an agreement because things could get worse. Downing called Hull to inform him that the picketers were scaring his crew. After the Glennallen job was completed, Downing called Hull a second time. Hull told Downing that there were only supposed to be a few picketers and they were not supposed to say anything.

In early June 1986, AUC began its next job installing underground telephone and electrical line at the Granite Heights subdivision near Palmer. IBEW picketers were present three to five days during the roughly week-long job. The picketers' behavior was more aggressive at Granite Heights than at Glennallen. The picketers physically leaned on AUC's equipment and blocked the roadway with their cars, interfering with AUC work. AUC employees recounted that Shemel incited the picketers on several occasions. Shemel threw a rock at AUC employees working in a ditch beneath him, and challenged an employee to come out of the ditch and fight him. Another picketer kicked a stone in the direction of the same AUC worker in the ditch beneath him, and asked whether the worker had made out his will yet. In addition to the stone throwing and taunts to fight, picketers spat on a worker in the ditch beneath them. Picketers also made threats to kill AUC employees and they told Downing they would rape his daughter.

Downing again spoke with Shemel and Hull about the threats and violence at Granite Heights. Hull repeated that there were only supposed to be a handful of picketers at the site and that they were instructed to stand back and to not say anything. Shemel, however, told Downing that he should sign an agreement to make the problem go away.

On June 14, 1986, AUC began installing about a mile of electrical transmission line and poles along Eklutna Lake Road. IBEW picketers first arrived at the job on June 17, 1986. Shemel acted as the leader once again. The threats to kill AUC employees and to rape their daughters continued. In some instances, the death threats were made by picketers displaying and sharpening large knives.

The picketers also resorted to methods other than threats. Picketers again parked their cars and stationed themselves so as to interfere with AUC work and equipment. On one occasion, a picketer hit an AUC worker in the neck with a rock. On another occasion, a group of twelve to fifteen picketers surrounded a truck driven by the AUC foreman, bouncing the truck and spitting on the windshield. AUC equipment was also vandalized: a hydraulic hose on a backhoe was cut, a cab had bullet holes in it, and a truck radiator was punctured. AUC was forced to hire night watchmen to guard its equipment.

Due to the problems, Downing contacted the Anchorage Police Department for assistance. The police maintained a presence at the scene during much of the time that AUC worked. Although AUC could generally get its work done when the police were present, AUC could only work on the project four days a week rather than seven, as intended, due to limited police resources.

AUC applied for a temporary restraining order against Local 1547 on June 19, 1986. The TRO was issued on June 20 and prohibited picketers from approaching within 200 feet of AUC workers, from interfering with AUC work, and from threatening or assaulting AUC workers. Local 1547 leaders informed its members of the TRO terms on June 20. On June 21, Hull recommended to Local 1547's executive board that the Local withdraw its sanction of the picketing, and the executive board agreed.

Despite issuance of the TRO and Local 1547's revocation of its sanction, the picketing activities continued much as they had before. Picketers continued to shout threats and to stand so close that they sometimes interfered with AUC's work. A day after the sanction was withdrawn, AUC workers discovered that a power pole had been sawed halfway through and that the anchor rods holding its guide wires had been loosened. AUC also discovered other acts of vandalism in which anchor rods were loosened and small pieces of equipment were removed.

Although Local 1547 withdrew its sanction on June 21, some evidence indicated that it may have continued to support the Eklutna picketing. In the minutes of a July 1 meeting, IBEW's assistant business manager reported, "Pressure on Downing to continue." Also, the minutes of a linemen meeting on July 17 state, "Need some new faces to picket at Eklutna." Finally, the coordinator of the IBEW's picket program gave credit to picketers for any time reported at Eklutna, apparently before and after the sanction was withdrawn.

AUC ultimately finished the Eklutna project later than planned and at greater expense than originally estimated. Although the job was completed behind schedule, the Matanuska Electric Association did not as-sess the $500 per day in liquidated damages authorized under the contract.

B. *Procedural Background*

AUC's original complaint against IBEW was filed on June 19, 1986. A jury trial was held where AUC presented claims of negligence, intentional interference with contractual relations, and intentional interference with property. AUC sought both compensatory damages and punitive damages.

The jury returned a verdict for AUC on all its claims, awarding $11,622.05 in compensatory damages. The jury also concluded that punitive damages were warranted. In a second trial phase, the same jury awarded $425,000 in punitive damages.

Local 1547 moved for a new trial on the issue of punitive damages or, alternatively, for a remittitur of punitive damages. Judge Shortell denied the motion for a new trial on punitive damages on the condition that AUC accept a remittitur of the punitive damages award. The remittitur reduced the punitive damages by half, from $425,000 to $212,500. AUC accepted the remittitur. The amended final judgment totaled $291,226.57, and included $26,767.18 in attorney's fees, $21,787.64 in costs, and $18,549.70 in prejudgment interest.

Local 1547 appeals the denial of its motion for a new trial on the issue of punitive damages, and alternatively, the excessiveness of the remitted punitive damages award. AUC cross-appeals the trial court's reduction of the jury's punitive damages award.

III. *DISCUSSION*

A. *Did the Trial Court Abuse Its Discretion in Denying a New Trial on the Issue of Punitive Damages?*

 The decision to order a new trial or a remittitur rests within the sound discretion of the trial court. *See Teamsters Local 959 v. Wells*, 749 P.2d 349, 360 (Alaska 1988). We review the trial court's decision to deny a new trial for an abuse of discretion. *See Exxon Corp. v. Alvey*, 690 P.2d 733, 741 (Alaska 1984). We must affirm the denial of a new trial if, viewing the evidence in the

light most favorable to the non-moving party, an evidentiary basis exists for the jury's decision. *See Richey v. Oen*, 824 P.2d 1371, 1375 (Alaska 1992) (citations omitted). The decision to deny a new trial will be reversed only when the evidence supporting the verdict was so completely lacking or slight and unconvincing as to make the verdict plainly unreasonable and unjust. *See id.*

The trial court denied IBEW's motion for a new trial on liability for punitive damages, concluding that IBEW's motion did little more than reiterate the factual arguments rejected by the jury. That observation continues to apply on appeal.

Punitive damages may be awarded only when a defendant's conduct is outrageous. *See Chizmar v. Mackie*, 896 P.2d 196, 210 (Alaska 1995). The standard of proof applicable to a claim for punitive damages is the clear and convincing standard. *See* AS 09.17.020. In the statement of facts portion of this opinion we have set forth the evidence in some detail, viewed most favorably to AUC. That evidence is ample to support a jury determination of outrageous conduct and it is sufficiently definite—a reasonable fact finder could conclude that the clear and convincing standard had been satisfied.

IBEW contends that when legally protected picket line behavior is excluded from consideration the outcome must be different. Peaceful picketing is a protected form of speech. *See, e.g., Thornhill v. Alabama*, 310 U.S. 88, 101–02, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); *American Federation of Labor v. Swing*, 312 U.S. 321, 325, 61 S.Ct. 568, 85 L.Ed. 855 (1941). But threats of bodily harm, personal assaults, and property destruction are not constitutionally protected

forms of speech. *Cf. Youngdahl v. Rainfair, Inc.*, 355 U.S. 131, 135, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957) ("the state court was within its discretion in enjoining future acts of violence, intimidation, and threats of violence by the strikers and the union"). Again, there is ample evidence of conduct which crossed the line that separates protected from unprotected activity to justify a punitive damage award.

IBEW also argues that in considering whether the evidence was sufficient to justify an award of punitive damages we should disregard testimony concerning Local 1547's conduct that only caused distress to individual AUC employees. Citing *American National Watermattress Corp. v. Manville*, 642 P.2d 1330, 1335 (Alaska 1982), IBEW contends that since only AUC was the plaintiff, only conduct of an outrageous nature directed at AUC should have been considered. In *Manville* we observed that for a plaintiff to recover punitive damages it was not enough to show a pattern of outrageous conduct toward the rights of others; she had to show that the pattern extended to her. *Id.* That requirement was satisfied in the present case as the conduct in question, threatening and assaulting AUC's employees, can reasonably be viewed as having been directed toward AUC.

IBEW also argues that evidence of wrongful conduct not tied to Local 1547 officers, employees, and agents must be excluded in considering whether a new trial should have been granted. The parties agreed on the instruction that the trial court gave concerning the standards for determining under what circumstances IBEW could be found responsible for the conduct of its officers, employees, and agents.[2] Under this instruc-

2. Instruction No. 21 provided:

I will now tell you how to decide whether Local 1547 is legally responsible for the acts or omissions of its officers, employees and/or agents. Local 1547 is legally responsible if you decide that it is more likely than not true that

1) the officer, employee and/or agent of Local 1547 agreed to do something for Local 1547; and

2) under the agreement, Local 1547 had the right to control the actions of the officer, employee and/or agent, whether or not Local 1547 used its control; and

3) the officer, employee and/or agent's acts or omissions were within the reasonable scope of what he reasonably believed he was asked to do and agreed to do.

I do not think that you will have difficulty understanding how to decide whether particular officers, employees and/or agents agreed to do something for Local 1547, although you should understand that there is no requirement that the agreement be in any particular form.

tion the jury could have reasonably found that IBEW was responsible for virtually all the wrongful conduct in question. Thus we are not required to limit the evidence that we consider.

### B. Did the Trial Court Abuse Its Discretion in Granting Remittitur?

#### 1. Standard of review

 We review the trial court's grant of a remittitur for an abuse of discretion. *See* *International Brotherhood of Teamsters, Local 959 v. King,* 572 P.2d 1168, 1178 (Alaska 1977); *Hash v. Hogan,* 453 P.2d 468, 472 (Alaska 1969). In order to reverse a grant of remittitur, we must be left with the definite and firm conviction that the judge made a mistake in granting the remittitur or ordering a new trial. *See King,* 572 P.2d at 1178.

---

The other questions you must decide might be more difficult. I will offer some additional explanation to help you.

If you decide there was an agreement in which one or more of the officers, employees and/or agents agreed to do something for Local 1547, you must then decide whether, under the agreement, Local 1547 had the right to control their actions. Local 1547 had the right to control the actions of its officer, employee and/or agent if it kept for itself the authority to make final decisions on how the officer, employee and/or agent was to carry out the activity he or she agreed to do, whether or not it used its control. On the other hand, Local 1547 did not have the right to control the actions of the officer, employee and/or agent, if the officer, employee and/or agent had the authority to make final decisions on how he or she was to carry out the agreed activity, and could ignore Local 1547's ideas or recommendations, even if Local 1547 received reports from the officer, employee and/or agent.

If you decide that Local 1547 had the right to control the officer, employee and/or agent's actions, then you must decide whether those actions were within the reasonable scope of what the officer, employee and/or agent reasonably believed he or she was asked to do and agreed to do. In doing so, you might want to consider some factors that I will give you. If you find that they apply in this case, this may suggest that the acts were within the scope that I have described. If you find they do not apply, this may suggest that the acts were outside the scope. These are the factors:

a) the acts or omissions of the officer, employee and/or agent were the kind or similar to the kind requested by Local 1547;

b) the acts or omissions of the officer, employee and/or agent occurred substantially when they were requested;

c) the purpose of the officer, employee and/or agent's acts was to serve Local 1547, not his own benefit;

d) the acts or omissions of the officer, employee and/or agent did, in fact, serve the interests of Local 1547;

e) the acts or omissions of the officer, employee and/or agent were similar to acts done by Local 1547 itself or by other persons working for Local 1547;

f) the acts or omissions of the officer, employee and/or agent reasonably would have been expected by Local 1547;

g) the acts or omissions of the officer, employee and/or agent were done with equipment provided by Local 1547;

h) the officer, employee and/or agent did things usually required by Local 1547 of people working for it;

i) the acts or omissions of the officer, employee and/or agent were similar to other acts authorized by Local 1547 or reasonably related to other acts authorized by it;

j) the acts or omissions of the officer, employee and/or agent were reasonably necessary to accomplish something that Local 1547 had requested or required;

k) the acts or omissions of the officer, employee and/or agent usually are done in connection with the acts requested by Local 1547;

l) the acts or omissions of the officer, employee and/or agent were limited by instructions from Local 1547;

m) the acts or omissions of the officer, employee and/or agent were closely related to those actually requested or authorized by Local 1547;

n) the acts or omissions of the officer, employee and/or agent were those which are commonly done by people seeking to accomplish similar goals.

You may, of course, also use any other factors that help you decide.

If you decide that it is more likely than not that there was an agreement by one or more officers, employees and/or agents to do something for Local 1547, that under the agreement Local 1547 had the right to control the actions of the officer, employee and/or agent, and that the acts described to you were within the reasonable scope of what the officer, employee and/or agent reasonably believed he or she was asked to do and agreed to do, then Local 1547 is legally responsible for the actions of that person or persons. Unless you find all of these things to be more likely than not true, Local 1547 is not legally responsible for the actions or omissions of its officers, employees and/or agents.

2. *Did the trial court err in concluding that the punitive damage award was excessive and in reducing the award from $425,000 to $212,500?*

 The jury awarded AUC punitive damages in the amount of $425,000. The trial court denied IBEW's motion for a new trial on punitive damages on the condition that AUC accept a remittitur reducing the punitive damages by half. AUC accepted the remittitur and was awarded $212,500 in punitive damages. Despite its acceptance of this reduced award, AUC argues in its cross-appeal that the jury's award of $425,000 in punitive damages was not excessive and that the trial court abused its discretion in requiring a remittitur.

IBEW argues that AUC has "no right to appeal" this issue because AUC accepted the trial court's remittitur. IBEW argues that this court should adopt the federal rule barring plaintiffs from challenging on appeal the amount of a remitted award when they accept the trial court's remittitur. *See Donovan v. Penn Shipping Co.*, 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977) (per curiam). We have not previously addressed this issue. *See Exxon Corp. v. Alvey*, 690 P.2d 733, 745 n. 20 (Alaska 1984).

We agree with the *Donovan* rule with one modification. If the defendant appeals the amount of the remitted award, then the plaintiff should be free to cross-appeal the remittitur, notwithstanding the fact that he has previously accepted the reduced amount. *See, e.g., Burns v. McGraw–Hill Broad. Co.*, 659 P.2d 1351, 1355 (Colo.1983). The reasons underlying this modification of the *Donovan* rule were well-explained by the Wisconsin Supreme Court in *Plesko v. City of Milwaukee*, 19 Wis.2d 210, 120 N.W.2d 130 (1963).

The reasons motivating the majority to adopt the [*Donovan*] rule are these: The objective underlying the recommended procedure for granting an option to accept judgment for a reduced amount of damages in lieu of having a new trial, where the damages awarded by the jury are determined by the trial court to be excessive, is to avoid the delay and expense of an appeal or a new trial. In most situations, it is likely that the party will accept judgment for such reduced damages rather than undergo the expense, delay, and uncertainty of result of an appeal or new trial. Nevertheless, if a party found liable to pay damages appeals the judgment resulting from the other party's accepting such reduced damages, this objective had been negatived. When plaintiff is forced to undergo an appeal by the action of the opposing party, after plaintiff has accepted judgment for such reduced damages, it seems unfair to prevent his having a review of the trial court's determination leading to the reduction in damages, especially if plaintiff has accepted same only to avoid the delay and expense attending an appeal. Furthermore, [this modified *Donovan*] rule herein announced may to some extent discourage appeals by the party held liable because of the possibility that the party who has accepted judgment for the reduced damages may prevail on his motion for review and have the jury's verdict reinstated.

*Id.* at 135.

Because IBEW appealed the amount of the remitted $212,500 award, we will consider AUC's cross-appeal of the remittitur from the $425,000 jury award.

In *Sturm, Ruger & Co. v. Day*, 594 P.2d 38 (Alaska 1979), *modified* 615 P.2d 621 (1980), *modified* 627 P.2d 204 (1981), *cert. denied* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981), *overruled on other grounds, Dura Corp. v. Harned*, 703 P.2d 396, 405 n. 5 (Alaska 1985), we articulated four factors that should be considered when reviewing punitive damages for excessiveness: (1) the magnitude and flagrancy of the offense, (2) the importance of the policy violated, (3) the ratio of punitive damages to compensatory damages, and (4) the wealth of the defendant. *Id.* at 48; *see also Clary Insurance Agency v. Doyle*, 620 P.2d 194, 205 (Alaska 1980). The trial court carefully evaluated these factors in concluding that a remittitur was necessary.

 Some of the *Sturm, Ruger* factors favored a large punitive damages award. IBEW's conduct in this case consisted of

ongoing acts of intimidation, violence, destruction of property, and disregard for a court's temporary restraining order. Such conduct violates a strong policy interest in ensuring that labor disputes are resolved peacefully and lawfully. However, other *Sturm, Ruger* factors favored a reduction in the punitive damages award. For example, the ratio of punitive damages to compensatory damages was 36 to 1, and Local 1547's net worth was estimated to be only about four times greater than the punitive damages award of $425,000. Given these competing factors, we cannot conclude that the trial court abused its discretion by reducing the punitive damages award from $425,000 to $212,500.

### C. Was the Reduced Punitive Damages Award of $212,500 Still Excessive?

■■■■ IBEW argues that despite the remittitur, the punitive damages award of $212,500 was still excessive and that the trial court abused its discretion by not reducing the award further. A punitive damage award is excessive if it is manifestly unreasonable. *See Pluid v. B.K.,* 948 P.2d 981, 984 (Alaska 1997). We also look to the factors articulated in *Sturm, Ruger* to determine if an award is excessive.

■■■ IBEW first argues that the 18–to–1 ratio of the $212,500 punitive damages to compensatory damages is still too high. This ratio, however, only serves as a rough working comparison; no definite ratio is required. *See Ben Lomond, Inc. v. Campbell,* 691 P.2d 1042, 1048 (Alaska 1984). Instead, the other *Sturm, Ruger* factors—the flagrancy of the offense, the policy violated by the offense, and the wealth of the defendant—are of greater significance. *See Ben Lomond,* 691 P.2d at 1048.

IBEW next argues that the $212,500 punitive damages award constitutes twelve percent of Local 1547's total assets, and almost eighty percent of its liquid assets. However, the Local's liability insurer paid the Local $220,000 to settle its liability on AUC's claims. This undercuts IBEW's argument that the award will seriously impair its ability to perform its functions.

Local 1547 also contends that competing policy interests are at stake. While acknowledging the policy of discouraging threats and violence, the Local argues that the policy of encouraging free expression through picketing is chilled by large punitive damages awards. This argument is not persuasive. The conduct in this case does not fall near the margins of protected speech. Instead it consisted of unprotected threats, and assaultive and destructive behavior. Therefore, although it is to be hoped that the punitive damages award in this case will discourage such unlawful practices in the future, it does not follow that constitutionally protected speech will be chilled.

Finally, Local 1547 argues that sparse evidence ties it to the outrageous conduct. However, viewing the evidence in the light most favorable to AUC, as we must, the jury was presented with ample evidence to conclude that IBEW was responsible for the conduct under the standards established in the applicable instruction.[3]

We conclude that the punitive damages award of $212,500 was not manifestly unreasonable.

## IV. CONCLUSION

The judgment is AFFIRMED.

---

**3.** *See supra* pp. 853–855 and note 2.