CENTRAL BERING SEA FISHER-
MEN'S ASSOCIATION and Carl
Merculief, Appellants,

v.

Susan D. ANDERSON, Appellee.

No. S–9955.

Supreme Court of Alaska.

Sept. 6, 2002.

Rehearing Denied Nov. 18, 2002.

Susan Orlansky, Jeffrey M. Feldman, Ruth Botstein, Feldman & Orlansky, Anchorage, for Appellants.

Timothy J. Petumenos, Peter C. Nosek, Birch, Horton, Bittner & Cherot, Anchorage, for Appellee.

Before: MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

A jury awarded Susan Anderson compensatory and punitive damages against Central Bering Sea Fishermen's Association and its president, Carl Merculief, based upon her claims of constructive retaliatory discharge, promissory estoppel, and defamation. The Association and Merculief challenge various aspects of the damages awards. We agree that the jury's award of lost earnings is excessive; however, we sustain the jury's punitive damages award.

## II. FACTS AND PROCEEDINGS

Central Bering Sea Fishermen's Association is a nonprofit economic development organization established by fishermen in St. Paul in the Pribilof Islands in conjunction with the community development quota program ("CDQ"). The program was instituted by the North Pacific Fisheries Management Council to allocate a portion of the fisheries' resource to the coastal villages of western Alaska. Carl Merculief was the president of the Association in 1997 and 1998.

In late 1997 Susan Anderson approached the Association about working for it as an economic development project coordinator. At the time, Anderson held a similar job with Yukon Delta Fisheries Development Association, another CDQ group. After Anderson's first interview, Merculief told her that he would like to hire her but that he needed the approval of the Association board of directors.

In January 1998 Merculief asked Anderson to start work with the Association, as Kathy Faltz, the office manager and controller, had suddenly fallen ill and Merculief needed help with the corporation's accounting. At a January 9 meeting of the Association board of directors, which Anderson attended, Mercu-

lief proposed hiring Anderson to do economic development work. After some discussion, the board agreed to hire Anderson and to pay her initially at the rate of $55,600 annually. The board also promised to give Anderson a written contract and to raise her salary to $60,000 if she successfully concluded a probationary period. The board instructed Anderson and Merculief to negotiate an employment contract to present to the board for approval after the completion of her probation.

Anderson began work on January 16, 1998. She performed some of Faltz's bookkeeping supervision and accounting duties in addition to her economic development responsibilities. Despite the burden of additional duties, Anderson performed well in her economic development work. During this time, personnel working for Anderson began to approach her to report irregularities and potential theft of Association assets by Faltz. When Anderson reported these allegations to Merculief, Merculief refused to look into the matter, citing Faltz's current illness.

In early April 1998 Anderson and Merculief negotiated a draft employment contract to present to the board. The board was to consider the proposed contract at its April 13 meeting; however, at the meeting the Association's attorney Roger DuBrock had a different version of the draft contract. The confusion over the multiple drafts of the contract was compounded by discussion of where this economic development position should be located—St. Paul or Anchorage—and whether or not the position should continue to exist if the Anchorage office closed. Anderson explained to the board the advantages of having an office in Anchorage and told the board that she would not be able to live and work on St. Paul. Due to the confusion over the multiple contract drafts and the contingency of the position on office location, the board voted not to approve Anderson's contract at that time; however, the board nonetheless assured Anderson that she was doing a good job and implied that it would approve a contract at a later date.

Shortly after this board meeting, on April 16, the Association's day-to-day bookkeeper reported to Anderson that Merculief had been charging personal expenses to the Association's credit card without submitting the proper reimbursements. Follow-up on this report revealed multiple instances in which Merculief appeared to have misappropriated company funds. Anderson informed two board members of the problem and asked if she had the authority to look into this matter. The board members responded that she did. On April 23, 1998, Anderson brought her concerns to DuBrock, the Association's attorney. DuBrock responded that they had to proceed very carefully, as making these allegations could threaten Anderson's job.

The next morning, Merculief met Anderson at her office and, without explanation, told her to go home. Merculief then called DuBrock, insisting that he wanted to fire Anderson, but DuBrock advised that any action against Anderson would have to be taken by the board. That same day, the board met and decided that while it would order an audit to look into Anderson's allegations, Anderson would be suspended without pay. In addition, the board ordered that the locks to the Association offices be changed and that Anderson be instructed not to return to the Association and not to speak with any representative of the Association other than DuBrock. No one informed Anderson of the board's actions; however, Anderson received a call that same day from an industry colleague who had been told that Anderson no longer worked at the Association and that she had been fired. These statements convinced Anderson that she was being fired and on Monday morning she went to DuBrock to turn in her office keys and cell phone. She brought along a memorandum to which she had attached copies of business records documenting her concerns about Merculief's use of Association funds. Later that morning, DuBrock delivered to Anderson a letter in which he issued the board's orders and informed her that she had until May 1, 1998, to document her concerns about fraud.

Anderson retained counsel. On April 30, 1998, she wrote DuBrock, through counsel, and demanded her job back, asserting that she had a de facto contract for a definite term with the Association. She also warned

that the Association's actions were improperly retaliatory.

The next day Merculief contacted Glenn Haight, the CDQ manager for the state, and reported that Anderson had falsely accused Merculief of misappropriation and that she would be terminated for her misconduct. Merculief also told Haight that Anderson had threatened previous colleagues both personally and professionally. Haight passed along Merculief's remarks in an e-mail sent to a number of high officials in state government as well as members of the CDQ industry.

On May 7, 1998, the Association board held a meeting in which Anderson was accused of: (1) breaking into Association offices; (2) illegally accessing the Association's computers; (3) stalking Merculief; (4) making death threats; and (5) retaliating against the Association by accusing Merculief of wrongdoing after she was suspended. Neither of the two board members that Anderson had approached with her concerns voiced their knowledge that Anderson had raised her concerns prior to her suspension, not after.

The board had DuBrock send a letter to Anderson explaining that the reason for her suspension was that an employee had told the board that Anderson was out to destroy Merculief. However, that employee reported to Anderson that the board's representation of her statement to them was untrue, that those present at the May 7 meeting wanted Anderson "gone," and that no one on the board cared about the Association's finances.

Meanwhile, DuBrock commissioned an audit to examine the nine instances of fiscal concern that Anderson had identified. The board reviewed this audit—the results of which supported most of Anderson's concerns—at its May 22, 1998 board meeting. At that meeting Merculief alleged that Anderson had instructed him to engage in misconduct; Anderson denied these allegations at trial.

After some indecision as to what to do with Anderson, the board offered her the economic development job on St. Paul. The board simultaneously reelected Merculief president, moved his position to St. Paul, and named as Anderson's supervisor a successful applicant for an internship that Anderson had created and advertised. Furthermore, the board did not offer Anderson a contract; instead, it appeared that her employment would be at will. When Anderson talked to others to investigate the sincerity of the offer, she found that the offer was "just a way [for the Association] to get rid of her." She thus declined to appear in St. Paul by September 1, 1998, as instructed. DuBrock wrote Anderson's attorney on September 11, 1998, asserting that the corporation considered Anderson's failure to appear a resignation.

In order to protect herself, Anderson had begun circulating resumes and applying for jobs during the summer and fall of 1998. She accepted employment with Bank of America in mid-September at $45,000 per year. After the bank was sold in December 1998, Anderson quit her job at the bank and decided to go to school to become a barrister in Australia.

Anderson filed suit against the Association and Merculief in November 1998. She went to trial in April 2000 on three causes of action: (1) constructive retaliatory discharge; (2) promissory estoppel; and (3) defamation. She brought the first two charges against the Association only; they are alternative theories behind Anderson's claim that she was wrongfully terminated, for which she sought past and future lost wages. Anderson based her defamation claim on nine statements made about her by Merculief and other Association agents. Anderson claimed, and the court concluded, that most of these statements were defamatory per se.

The jury found for Anderson on both of her theories of wrongful termination and awarded her $20,000 for lost back wages and $217,000 in lost future wages. The jury based the back pay award on the difference between Anderson's annual salary at the Association and her annual salary at Bank of America. They determined the future lost wages award by comparing the income Anderson would have had if she had remained at the Association for the duration of her working life with the income she would have had if she had remained at Bank of America until retirement.

The jury also found that Anderson proved all nine of the defamatory statements she asserted. They held Merculief responsible for eight of those statements and the Association responsible for two of them (including one that had also been attributed to Merculief). The jury awarded Anderson $15,000 for emotional distress and $20,000 for loss of reputation as a result of the defamation. In addition, the jury awarded punitive damages in the amount of $200,000 against Merculief and $400,000 against the Association.

The Association and Merculief filed a comprehensive post-trial motion to set aside the verdict, strike components of the economic damages award, order a new trial, or grant a remittitur of the punitive damages awards. The trial court denied the motion in its entirety. The Association and Merculief appealed the jury's awards to this court.

## III. DISCUSSION

### A. Standard of Review

 The Association argues that the superior court erred in upholding the jury's award of economic damages, both because the award lacked adequate evidentiary support and because the court incorrectly applied the law. The determination of what law to apply is a legal question for which we use our independent judgment.[1] The adequacy of evidence supporting the jury's award is a mixed question of law and fact.

As such, we review the evidence presented in the light most favorable to Anderson and evaluate de novo the legal question of whether that evidence is specific enough to support the jury's economic damages award.[2]

 The Association also argues that Anderson's improper closing statement, the court's jury instructions on punitive damages caps, and the excessive nature of the punitive damages awards invalidate the jury's determination of punitive damages. This court reviews de novo the propriety of a closing statement.[3] We use our independent judgment to determine the legality of a jury instruction.[4] With regard to the excessiveness of punitive damages, we have reviewed a lower court's decision on a motion for remittitur or new trial for abuse of discretion.[5] However, in light of the United States Supreme Court's decision of *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*,[6] we will review de novo the question of whether punitive damages are grossly excessive and thus unconstitutional under the due process clause of the Fourteenth Amendment.

### B. The Superior Court Erred in Upholding the Jury's Award of Economic Damages.

Anderson presented the jury with alternative theories of wrongful termination: a claim of constructive retaliatory discharge[7] and a promissory estoppel claim.[8] The jury

1. See *Bandow v. Bandow*, 794 P.2d 1346, 1347 n. 3 (Alaska 1990).

2. See *Alaska Tae Woong Venture, Inc. v. Westward Seafoods, Inc.*, 963 P.2d 1055, 1061–62 (Alaska 1998); *Ben Lomond, Inc. v. Schwartz*, 915 P.2d 632, 636–37 (Alaska 1996).

3. See *State v. Gilbert*, 925 P.2d 1324, 1326–27 (Alaska 1996).

4. See *Stinson v. Holder*, 996 P.2d 1238, 1244 (Alaska 2000); *Chenega Corp. v. Exxon Corp.*, 991 P.2d 769, 775 (Alaska 1999).

5. See *Era Aviation, Inc. v. Lindfors*, 17 P.3d 40, 48 n. 40 (Alaska 2000); *IBEW, Local 1547 v. Alaska Util. Constr., Inc.*, 976 P.2d 852, 855 (Alaska 1999).

6. 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).

7. The superior court instructed the jury that the elements of the constructive retaliatory discharge claim were that the Association made Anderson's working conditions intolerable because of her reports that Merculief was misusing corporate assets and that the conditions were so intolerable that a reasonable person in her position would have felt compelled to resign.

8. The court instructed upon the following elements as to Anderson's promissory estoppel claim:

 1. The defendant made a promise to the plaintiff;
 2. The defendant expected or reasonably should have expected that the promise would cause plaintiff to act;
 3. In reliance on the defendant's promise, the plaintiff acted, thereby substantially changing her position; and
 4. Justice requires enforcement of the defendant's promise.

found in Anderson's favor on both claims. The Association's first point on appeal is that the jury's award of $20,000 in lost back wages and $217,000 in lost future wages cannot legally stand.

The Association argues that based on substantially undisputed evidence, the contract contemplated by the parties was a one-year contract, terminable without cause on fifteen days notice, with a salary of $60,000–65,000 a year. At trial Anderson accepted the lower salary figure as more probable, and her economic expert used it in his damages calculations. Exc. 459 (Tr. 1692) The Association argues that if the contract had been signed and fully performed Anderson would have earned $60,000 and that this, less the amount that Anderson could expect to earn during one year of alternative employment, should reflect the maximum measure of her lost earnings.[9]

Anderson responds that while she expected a one-year contract, she also "reasonably expected to fulfill a long-term need [the Association] had for economic development, regardless of the form of a potential contract." She therefore argues that the expected term of the contract should not limit her damages for lost earnings.

■ We agree with the Association's position that under the facts and circumstances of this case Anderson's lost earnings should be measured by the amount and duration of the contract that she expected to have with the Association. "The goal of contract damages is to place the nonbreaching party in as good a position as if the contract had been fully performed."[10] Here that goal is met by awarding to Anderson the year's salary she expected from the Association, less the amount she could expect to earn in alternative employment during that period. According to Anderson's calculations her award for a one-year loss of earnings should be approximately $13,000.[11]

Our precedent provides specific support for limiting Anderson's economic damages to the terms of her expected contract. In *Skagway City School Board v. Davis* we addressed the question of whether a wrongfully discharged employee could collect damages for injury to his reputation and impairment of his future earning capacity.[12] We stated:

> The normal rule is that a wrongfully discharged employee is entitled to the total amount of the agreed upon salary for the unexpired term of his employment, less what he could earn by making diligent efforts to obtain similar employment. Beyond this the employee is not permitted recovery for injury to his reputation.[13]

We explained that

> [t]he primary reasons underlying [this] rule are that (1) the computation of damages for injury to reputation is unduly speculative, and (2) such damage [to reputation and future earning ability] cannot reasonably be presumed to have been within the contemplation of the parties when they entered into the contract.[14]

The question of Anderson's economic damages is much like the one presented in *Skagway*. In *Skagway*, the defending school board had given the plaintiff a three-year contract to serve as superintendent. After two years, performance-related charges against the plaintiff led the school board to

---

The special verdict form reduced the inquiry to two questions: "Did [the Association] promise Susan Anderson a contract of employment?" and "Did [the Association] break its promise to provide Susan Anderson a contract of employment?"

9. The Association raised these contentions in a mid-trial motion for partial directed verdict, in proposed jury instructions, and in a renewed motion for directed verdict made at the end of the trial.

10. *Luedtke v. Nabors Alaska Drilling, Inc.*, 834 P.2d 1220, 1226 (Alaska 1992) (citation omitted).

11. Anderson based her calculations on an annual salary of $60,000 with the Association and an annual salary of $45,000 with Bank of America. She adjusted the figures for a seven percent net Social Security tax and found that one year's lost wages were equal to $13,115.

12. 543 P.2d 218, 224–28 (Alaska 1975), *overruled on other grounds by Diedrich v. City of Ketchikan*, 805 P.2d 362 (Alaska 1991).

13. *Id.* at 225 (citing 5 Arthur L. Corbin, Corbin on Contracts § 1095 (1964)).

14. *Id.*

refuse to renew his contract for a third year.[15] Although the plaintiff's expert witness testified that this discharge would prevent the plaintiff from obtaining future employment as a school administrator and that it would negatively impact his future earning capacity,[16] we limited the plaintiff's damages to those flowing from the rest of his promised term of employment (another year), minus what he was able to earn in mitigating damages during that time.[17]

This court made a similar finding in the context of a promissory estoppel claim in *Alaska Democratic Party v. Rice*.[18] There, we upheld a jury's finding that a prospective employee who was promised a two-year contract with the possibility of renewal for an additional two years was entitled to only the promised two years of salary, less what she was able to earn in alternative employment during that period.[19]

In our view Skagway and *Rice* control the present case and serve to limit Anderson's lost earnings damages.[20] We recognize that cases may exist where the specific term of an employment contract should not limit lost earnings damages.[21] But Anderson was to occupy a new position in a new company created by a new government program, allocating shares in a volatile industry. Thus this case presents no reason to consider an exception to the rule expressed in *Skagway* that damages for the breach of an employment contract are limited to the unexpired term of the contract.

Anderson also argues that the one-year term of her expected contract should not limit her lost earnings because she could have sought lost earnings as a part of her successful defamation claim. This argument fails. The jury made no award for lost earnings based on Anderson's defamation claim, nor was it asked to do so.

## C. The Trial Court Properly Upheld the Jury's Finding of Punitive Damages.

Due to Anderson's successful defamation claim against the Association and Merculief, the jury awarded Anderson $15,000 for emotional distress, $20,000 for reputational harm, and punitive damages totaling $400,000 against the Association and $200,000 against Merculief. The Association and Merculief argue that because of improprieties in Anderson's closing statement, the trial court's instruction of the jury on punitive damages caps, and the "excessive" nature of the punitive awards, this court should vacate

---

15. *Id.* at 220.

16. *Id.*

17. *Id.* at 225–28.

18. 934 P.2d 1313 (Alaska 1997).

19. *Id.* at 1320–21.

20. Future economic damages are barred, not only by the clearly implied contract terms in this case, but also by Anderson's failure to offer evidence sufficient to accurately calculate future damages. This court has found that "[a]n award cannot stand ... if the amount is the result of speculation," and that "a plaintiff alleging breach of contract must present evidence sufficient to calculate the amount of the loss caused by the breach." *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 222 (Alaska 1978); *Ben Lomond, Inc. v. Schwartz*, 915 P.2d 632, 636 (Alaska 1996) (citing *City of Palmer v. Anderson*, 603 P.2d 495, 500 (Alaska 1979)). *See also* 48 Am.Jur.2d, *Proof of Facts* § 18 (2001) ("Furthermore, damages for future losses must be reasonably certain of calculation and cannot be based upon speculation or conjecture.").

Anderson argues that three experts at trial adequately addressed the issue of future damages. She notes that she called both a vocational rehabilitation specialist/labor market analyst and an economist as experts to evaluate her post-termination options. However, those experts' use of Anderson's job at Bank of America to offset some future damages was not only speculative, but ignored reality. By the time of trial, Anderson no longer worked at Bank of America and instead had returned to school to become a barrister in Australia. Anderson's economist testified that her future income was "very speculative" and that she might make more money in her career as a barrister than she would have made if she had stayed at the Association. In addition, Anderson's rehabilitation counselor provided no factual data to substantiate his hypothesis that Anderson would have a lifetime earning loss in her new field despite the potential for higher annual earnings.

21. *See, e.g., Allen v. Cornish & Carey*, 1997 WL 195433, at *6–*7 (N.D.Cal., Apr.11, 1997) (lost future earnings under specified term contract not limited to term where there had been a long series of such contracts).

the jury's punitive damages awards and order a new trial on that issue. We disagree and affirm the jury's awards of punitive damages.

### 1. Anderson's discussion of corruption in closing argument was not improperly prejudicial.

 The Association and Merculief contend that Anderson's focus in closing argument on punishing the company's corruption was improper and that her closing should have instead focused on punishing the defamatory statements that harmed Anderson.[22] We disagree with appellants' assertion that Anderson's closing statement was improper in this regard.

The jury in this case could have found that the motive behind the Association's and Merculief's defamatory statements was that of covering up corruption. We agree with Anderson's argument that the Association and Merculief had a large financial stake in hiding any misconduct. Had the state found reason to investigate financial misappropriations occurring within the Association, the company could have lost its "highly lucrative CDQ allocation." Indeed, Merculief made a defamatory statement to Glenn Haight, CDQ manager for the state. Haight testified in deposition that Merculief's allegations that Anderson had falsely accused him and that she had personally and professionally threatened other colleagues led him to conclude that the state should take a "hands off" approach and not investigate. Thus there was evidence that Merculief and the Association used defamation to hide their misconduct and to safeguard their reputations and their CDQ allocation. The existence of corruption within the Association was therefore an important part of Anderson's theory of defamation, and Anderson's counsel appropriately addressed it in closing argument.

### 2. The trial court's instruction on statutory damages caps was harmless error.

Because the defamatory conduct at issue here took place in 1998, the jury's award of punitive damages is governed by AS 09.17.020. This statute limits punitive damages awards to the greater of three times compensatory damages or $500,000. Subsection (g) of the statute allows an increased award of up to $7,000,000 if "the fact finder determines that the conduct proven was motivated by financial gain and the adverse consequences of the conduct were actually known by the defendant or the person responsible for making policy decisions on behalf of the defendant." The statute is silent as to whether the court should inform the jury of the statutory caps or the legal significance of their findings as to motivation.

Here, over the Association's and Merculief's objection, the trial court instructed the jury that they could award a maximum of $500,000 in punitive damages, unless they answered "yes" to special verdict form questions 1 and 2—asking separately whether each defendant was motivated by financial gain and knew the adverse consequences of its conduct—in which case the jury could award up to $7,000,000 in punitive damages. The jury answered "yes" to both questions 1 and 2 of the special verdict form, and awarded punitive damages of $400,000 against the Association and $200,000 against Merculief. The Association and Merculief argue that, by informing jurors of AS 09.17.020's damages cap provisions, the trial court infringed on their constitutional right to a jury trial on punitive damages.

The Association and Merculief assert that article I, section 16 of the Alaska Constitution guarantees them the right to a jury trial to the extent that that right existed at common law, and that the trial court, by informing the jury of the applicable damages caps, interfered with the jury's ability to independently calculate, and ultimately to decide,

---

22. The Association and Merculief also contend that Anderson's closing argument was prejudicial because Anderson's counsel exhorted the jurors to "do their job" and asked them to consider broad societal issues outside the scope of the evidence. However, appellants failed to object at trial to Anderson's closing on this ground; thus, they failed to preserve their right to object on that ground here. We consider their argument waived. *See Jenkins v. Handel*, 10 P.3d 586, 592 (Alaska 2000).

that issue. They support their position by citing to a number of state court decisions that have found compensatory damages caps unconstitutional under their state constitutions.[23] Other states that have found caps constitutional have done so based on an assumption that the caps will be employed by the trial judge after the jury calculates its award of damages independent of the caps.[24]

Subsequent to the briefing in this case we resolved the question of whether the punitive damages caps of AS 09.17.020 are constitutional. In *Evans v. State* we held that the punitive damages caps are constitutional and do not infringe on the right to trial by jury.[25] That holding controls here. But *Evans* did not resolve the question whether it is appropriate—or constitutional—to instruct a jury as to the existence and the amount of the caps. We proceed to address that question.

██ The trial court here responded to appellants' objection to the cap instruction by giving the following instruction:

In giving these instructions to guide you on how punitive damages are to be determined, the court does not intend to express any opinion as to how much money for punitive damages you should award. You may not assume that because the court identifies ranges of damages or explains how to measure the damages that you are required to make an award of a particular

amount of punitive damages. The amount of punitive damages to award is entirely within the purview of you, the jury.

As Anderson correctly notes, we "presume that a jury follows the trial court's instructions." [26] Anderson contends that because the trial court instructed the jury not to use the caps as a gauge for an appropriate award, we should assume that the jury refrained from doing so.

██ We agree with the appellants that instructing the jury on the punitive damages caps was error. Putting the caps before the jury carried a substantial risk of suggesting the range of appropriate punitive awards.[27] Moreover, no countervailing benefit could be gained from the instruction.[28]

██ However, we find that under the circumstances of this case the error does not warrant reversal. Three factors lead to this conclusion. First, this is an issue of first impression in Alaska, and no clear guidance has been available on the issue. Second, the instruction quoted above warned the jury against drawing suggestive inferences from the caps and we normally presume that a jury follows such instructions.[29] And third, the fact that the jury awarded punitive damages totaling $400,000 against the Association and $200,000 against Merculief—when their findings as to financial motivation and actual knowledge entitled them to award up to

**23.** *See, e.g., Moore v. Mobile Infirmary Ass'n,* 592 So.2d 156, 159–62 (Ala.1991), *reh'g denied,* (Jan. 3, 1992); *Best v. Taylor Mach. Works,* 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057, 1076 (1997); *Morris v. Savoy,* 61 Ohio St.3d 684, 576 N.E.2d 765, 770–71 (1991); *Lakin v. Senco Prods., Inc.,* 329 Or. 62, 987 P.2d 463, 467–75 (1999); *Sofie v. Fibreboard Corp.,* 112 Wash.2d 636, 771 P.2d 711, 720–23 (1989), *reconsideration denied,* (Sept. 27, 1989).

**24.** *See, e.g., Boyd v. Bulala,* 877 F.2d 1191, 1195–96 (4th Cir.1989); *Kirkland v. Blaine County Med. Ctr.,* 134 Idaho 464, 4 P.3d 1115, 1120 (2000); *Murphy v. Edmonds,* 325 Md. 342, 601 A.2d 102, 116–18 (1992); *Adams v. Children's Mercy Hosp.,* 832 S.W.2d 898, 907 (Mo.1992) (en banc); *Wright v. Colleton County Sch. Dist.,* 301 S.C. 282, 391 S.E.2d 564, 569–70 (1990); *Etheridge v. Med. Ctr. Hosps.,* 237 Va. 87, 376 S.E.2d 525, 528–29 (1989).

**25.** —— P.3d ——, 2002 WL 1998141, Op. No. 5618 (Alaska, August 30, 2002).

**26.** *Knix v. State,* 922 P.2d 913, 923 (Alaska App. 1996).

**27.** *See* Michael S. Kang, *Don't Tell Juries About Statutory Damage Caps: The Merits of Nondisclosure,* 66 U. Chi. L.Rev. 469, 483–86 (1999) (Effect of statutory cap is that "juries might 'anchor' their deliberations to that amount.... [J]uries that know about a limit on damages tend to make awards that are significantly closer to that figure than juries that do not know about the limit.... [Another] effect of disclosure of statutory caps is the scaling effect. Research suggests that people tend to use the range of proffered response alternatives as a frame of reference for estimation tasks.").

**28.** We see no need, however, to cloak this type of error in constitutional terms.

**29.** *See Knix,* 922 P.2d at 923; *cf. Simms v. State,* 464 P.2d 527, 527–28 (Alaska 1970). *But see* Kang, *supra* note 27.

$7,000,000 against each—indicates that the jury did not improperly adjust its award of punitive damages based on the caps instruction.

### 3. The trial court did not err in refusing to remit the jury's punitive damages awards for excessiveness.

The trial court instructed the jury to consider the statutory factors set forth in AS 09.17.020(c) in its calculation of punitive damages. Alaska Statute 09.17.020(c) provides that in determining punitive damages, a fact finder may consider:

(1) the likelihood at the time of the conduct that serious harm would arise from the defendant's conduct;

(2) the degree of the defendant's awareness of the likelihood described in (1) of this subsection;

(3) the amount of financial gain the defendant gained or expected to gain as a result of the defendant's conduct;

(4) the duration of the conduct and any intentional concealment of the conduct;

(5) the attitude and conduct of the defendant upon discovery of the conduct;

(6) the financial condition of the defendant; and

(7) the total deterrence of other damages and punishment imposed on the defendant as a result of the conduct, including compensatory and punitive damages awards to persons in situations similar to those of the plaintiff and the severity of the criminal penalties to which the defendant has been or may be subjected.

The Association and Merculief argue that neither these statutory factors nor common law factors support the jury's punitive damages awards in this case. We disagree and find that under the circumstances of this

case, the punitive damages awards upheld by the trial court were not excessive.

### a. The Association and Merculief were aware of the high likelihood that their conduct would cause Anderson serious harm.

■ With respect to the first and second statutory factors, we believe that a jury could reasonably find that the Association's and Merculief's defamation of Anderson were likely to, and did, cause Anderson serious harm, and that the Association and Merculief must have been aware of this harm.

■ Appellants attempt to minimize the harm suffered by Anderson,[30] while ignoring her severe career and reputational losses. After Anderson reported Merculief's misdealings, Merculief and the Association board spread vicious lies about Anderson, accusing her of stalking Merculief and of personally and professionally threatening colleagues. The evidence supports the conclusion that the appellants made these statements deliberately, in order to "get rid of" Anderson, destroy her credibility, and hide the extent of ongoing financial misappropriations within the company. In addition, the jury found that the Association and Merculief both acted with financial motives and actual knowledge of the harm that their actions would cause.[31] Whether or not Anderson is able to recoup her financial losses in her new career as a barrister, the Association and Merculief effectively shut her out of the career and field that she had chosen. The trial court was within its discretion to consider this a serious and deliberate harm.

### b. Appellants' conduct was motivated by substantial financial gain.

■ With respect to the third statutory factor, evidence demonstrating that the Asso-

---

30. Appellants cite the following cases involving what they believe to be more serious harm than is present here: *IBEW, Local 1547 v. Alaska Util. Constr., Inc.*, 976 P.2d 852, 858–59 (Alaska 1999) (defendant repeatedly threatened and intimidated plaintiff, but punitive damages remitted to $212,500); *Norcon, Inc. v. Kotowski*, 971 P.2d 158, 163, 174–77 (Alaska 1999) (defendant sexually harassed plaintiff, who became so scared she slept in a car, but punitive damages limited to $500,000); *Sturm, Ruger & Co. v. Day*, 594 P.2d

38, 41, 48–49 (Alaska 1979), *modified*, 615 P.2d 621, 624 (Alaska 1980) (defendant seriously physically injured plaintiff, but punitive damages limited to $500,000), *partially overruled on other grounds by Dura Corp. v. Harned*, 703 P.2d 396, 405 n. 5 (Alaska 1985).

31. We generally give deference to the jury's findings of fact. *See Borchgrevink v. Borchgrevink*, 941 P.2d 132, 142–43 (Alaska 1997).

ciation and Merculief expected their behavior to result in financial gain, or at least avoidance of substantial financial loss, supports the jury's finding as to the appellants' motive. Haight, the state director of the CDQ program, testified that Merculief's statements to him about Anderson, her past, and her "false allegations" convinced him not to investigate the allegations of corruption in the Association. Had the state investigated, the Association could have lost its percentage of the CDQ allocation. According to Anderson:

> At $228,000 per percentage point of allocation, [the Association] stood to lose a considerable sum if its allocation were reduced. Direct benefits to [the Association's] board members in the form of loans and grants were in the hundreds of thousands of dollars, and administrative, per diem, and travel expenses were substantially in excess of guidelines used for non-profit grants by the state and federal government for an entity of its size. Were the financial misconduct and self-dealing of its board members revealed through Anderson's actions, [the Association] would have been subjected to stricter scrutiny from both state and federal agencies, and the board members stood to lose the lucrative benefits they were providing to themselves.

We conclude that there was more than enough evidence here to support the jury's finding of a financial motive.

### c. The Association's and Merculief's behavior upon discovery of their conduct warrants a large punitive damages award.

■ As to the fourth and fifth factors, while the short duration of the appellants' conduct does not weigh in favor of great punitive damages, their attitude and conduct toward Anderson upon her report of their misconduct does. Merculief's response to Anderson's concerns about his misconduct was to deny the misconduct or to blame Anderson for his own misappropriations. In addition, there is evidence that after it be-

came apparent that Merculief had misappropriated money from the Association, he resisted attempts to collect past overpayments made to him and continued to engage in financial improprieties. Merculief eventually resigned from his presidency after repeated pressure to halt his misappropriations.

The board, meanwhile, seemed to do its best to avoid dealing with Anderson's concerns about Merculief. When the board did commission an audit to investigate, it designed the audit to be as narrow as possible and failed to address broader issues of potential financial misdealing identified by Anderson as areas of concern. Further, the evidence indicates that the board's behavior toward Anderson did not change after it discovered that Anderson's concerns about Merculief were well-founded. Even during trial, a board member continued to blame her for being disloyal and falsely accusing Merculief. This board member continued to assert that Merculief had done nothing wrong. Although the board did attempt to collect from Merculief the amounts that he had misappropriated, it did not follow through with these attempts. In fact, it voted to indemnify Merculief for the punitive damages awarded against him. These behaviors indicate an individual and an organization unwilling to admit the misconduct they engaged in or the harm they inflicted upon their employee.

### d. The Association's and Merculief's financial conditions do not call for a reduction of the punitive damages.

■ As to the sixth statutory factor, consideration of appellants' financial condition need not reduce the jury's punitive damages awards. While the ratio of punitive damages awarded against Merculief individually— $200,000—to Merculief's annual salary at the time—$70,000—may be high in relation to ratios found in previous cases,[32] the jury here knew that the board had voted to indemnify Merculief for any punitive damages assessed against him. The jury's award, then, would have no impact on Merculief's finances.

---

**32.** Appellants cite *Norcon,* 971 P.2d at 174–76 (ordering remittitur where jury award equaled

three years of defendant's income).

As for the Association, the company is a nonprofit organization and thus earns no profits; however, the Association conceded that its unrestricted assets are an appropriate measure of its wealth. The Association's unrestricted assets in 1999 totaled $4.5 million. The company argues that not all of its unrestricted assets were truly uncommitted at the time of trial and that the court ought to use its actually unrestricted assets of approximately $1.5 million in assessing punitive damages; however, using the stated $4.5 million figure seems at least equally appropriate. Comparing the jury's $400,000 punitive damages award against the Association with the company's stated unrestricted assets at the time of trial, we find that the award was only 8.9% of the Association's unrestricted assets. We have previously upheld punitive damages awards that constituted a greater percentage of a defendant's assets.[33] Thus, the jury's awards here were not excessive on grounds of appellants' financial condition.

### e. Considerations of deterrence, past punitive awards, and common law factors support the jury's awards of punitive damages.

Finally, the seventh statutory factor, examining "the total deterrence of other damages and punishment imposed on the defendant ... including compensatory and punitive damages awards to persons in situations similar to those of the plaintiff,"[34] encompasses the appellants' concern for common law factors in assessing punitive damages. In comparing this jury award to those of past cases, the Association and Merculief treat the two punitive damages awards here as one award of $600,000 against the Association and point out that this court has only once allowed a punitive damages award larger than $600,000.[35] We note, however, that this does not mean that the jury's award here was excessive. Indeed, if we examine the awards as they were made—one award of $400,000 and one of $200,000—we see that case law supports awards of this magnitude.[36]

The Association and Merculief also argue that we should look for guidance to the United States Supreme Court's three guideposts for determining whether punitive damages awards are excessive: (1) the egregiousness of the conduct at issue, (2) the relation between the actual damages and the punitive award, and (3) whether the defendant received fair notice from statutes or previous cases that it could be subject to a punitive award of the magnitude in issue.[37] We agree and proceed to do so.[38]

---

33. See, e.g., IBEW, Local 1547, 976 P.2d at 859 (affirming remittitur where award equaled 25% of defendant's net worth and upholding reduced award equal to 12.5% of defendant's net worth).

34. AS 09.17.020(c)(7).

35. See Alaska Ins. Co. v. Movin' On Constr., Inc., 718 P.2d 472, 475 (Alaska 1986) (adjusting punitive damage award to $690,652.50 after reducing compensatory damages to sustainable amount of $230,217.50 to carry out jury's desire to award three times compensatory damages).

36. See, e.g., Norcon, 971 P.2d at 174–77 (upholding punitive damages of $500,000); Sturm, Ruger & Co., 594 P.2d at 48–49, modified, 615 P.2d at 624 (upholding punitive damages of $500,000), partially overruled on other grounds by Dura Corp., 703 P.2d at 405 n. 5.

37. See BMW of N. America, Inc. v. Gore, 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

38. As noted above, under Cooper Industries, Inc. v. Leatherman Tool Group, Inc., we review de novo the question whether punitive damages are grossly excessive and thus unconstitutional under the due process clause of the Fourteenth Amendment. 532 U.S. 424, 435, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) ("the question whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context de novo review of that question is appropriate") (citations omitted). In Cooper, the United States Supreme Court discussed the elements of the relevant constitutional inquiry:

[C]onstitutional violations [due to excessive fines] [are] predicated on judicial determinations that the punishments [are] grossly disproportional to the gravity of defendants' offenses. We have recognized that the relevant constitutional line is inherently imprecise, rather than one marked by a simple mathematical formula. But in deciding whether that line was been crossed, we have focused on the same general criteria: the degree of the defendant's reprehensibility or culpability; the relationship between the penalty and the harm to the victim caused by the defendant's actions; and the sanctions imposed in other cases for comparable misconduct.

First, as discussed above, the appellants' deliberate use of defamatory statements to "get rid of" Anderson and to push her out of her chosen career and industry reasonably constituted egregious misconduct.

Next, although AS 09.17.020 creates a normal ratio of 3–to–1 for the relationship between punitive and compensatory damages awards, this court has never enforced a specific ratio with regard to such awards. The statute itself clearly allows awards departing from the 3–to–1 ratio.[39] Moreover, this court has upheld several punitive damages awards where the ratio of punitive to compensatory damages was greater than 3–to–1. In *Pluid v. B.K.*, we upheld a punitive to compensatory ratio of 5–to–1.[40] In *Era Aviation, Inc. v. Lindfors*, we allowed a ratio of 10–to–1.[41] We upheld a 48.3–to–1 ratio in *Norcon v. Kotowski.*[42] As we noted in *Cameron v. Beard*, "[t]his court has refused to prescribe a definite ratio between compensatory and punitive damages. Though comparing punitive and actual damage awards is one way to determine if punitive damages are excessive, other factors ... are equally important to the determination."[43] Here, the jury awarded compensatory damages totaling $35,000 on Anderson's defamation claim and Anderson will be entitled to approximately $13,000 for lost wages. The jury's punitive awards of $400,000 and $200,000 result in ratios of 8.33–to–1 and 4.16–to–1 respectively. Given the Association's and Merculief's conduct and motives in this case, we find that those ratios are not excessive.

Finally, as to the United States Supreme Court's last criterion, the Association and Merculief did have notice that they could be subject to punitive damages awards of the magnitude here. We have upheld awards of this magnitude and greater in the past.[44] Further, AS 09.17.020 imparts notice that punitive damages may be awarded for malicious acts and that awards of up to $7,000,000 may be permitted where the acts are motivated by financial gain and committed with knowledge of their consequences.

Thus, while the jury's awards of punitive damages against the Association and Merculief are relatively high, they are not beyond sustainable limits according to statute, common law, or constitutional standards. Viewed deferentially or de novo, we conclude that the trial court did not err in upholding the jury's determination of punitive damages.

## IV. CONCLUSION

Based on the foregoing reasons, we order that the award of lost earnings be reduced in accordance with this opinion, and we affirm the punitive damages awards.

REVERSED in part and AFFIRMED in part.

FABE, Chief Justice, not participating.

---

Cooper, 532 U.S. at 434–35, 121 S.Ct. 1678 (citations and quotations marks omitted).

**39.** Subsection (f) limits punitive damages to the greater of $500,000 or an amount three times the compensatory award. And subsection (g) provides an even greater cap—$7,000,000—for cases such as this one, where the jury found a motive of financial gain and actual knowledge of the consequences of the appellants' conduct. AS 09.17.020(f), (g).

**40.** 948 P.2d 981, 984–85 (Alaska 1997).

**41.** 17 P.3d 40, 43, 49 (Alaska 2000).

**42.** 971 P.2d 158, 161, 177 (Alaska 1999).

**43.** 864 P.2d 538, 551 (Alaska 1993) (internal citations omitted).

**44.** *See supra* notes 35 and 36.