Dan K. REUST, Appellant/Cross–
Appellee,

v.

ALASKA PETROLEUM CON-
TRACTORS, INC., Appel-
lee/Cross–Appellant,

and

State of Alaska, Intervenor.

Nos. S–10910, S–10919.

Supreme Court of Alaska.

Oct. 28, 2005.

Rehearing Denied Feb. 17, 2006.

Arthur S. Robinson and Eric Derleth, Robinson & Associates, Soldotna, for Appellant/Cross–Appellee.

Douglas S. Parker, Preston Gates & Ellis, LLP, Anchorage, for Appellee/Cross–Appellant.

Jason T. Mogel and Christopher M. Kennedy, Assistant Attorneys General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Intervenor State of Alaska.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

A jury awarded Dan Reust compensatory and punitive damages after finding that Alaska Petroleum Contractors (APC) wrongfully terminated him in retaliation for testifying in previous litigation between APC and another former APC employee. APC and Reust both appeal.

As to the jury instructions to which APC preserved its objections, we discern no reversible error. We also hold that witness retaliation is against the public policy of this state, that APC failed to preserve its arguments against the emotional distress award, and that sufficient evidence supported an award of punitive damages. But because no reasonable jury could have found that the likely duration of Reust's employment would exceed three years, we remand for reduction of the lost wages awards. We reject Reust's challenges to the constitutionality of the statutes capping punitive damages awards and allocating half of such awards to the state and hold that the superior court did not err in allowing the State of Alaska to intervene, or in the timing of entry of judgment. But because the court applied the wrong punitive damages cap, we also remand for application of the correct cap.

## II. FACTS AND PROCEEDINGS

Dan Reust sued Alaska Petroleum Contractors for wrongful termination, claiming his discharge violated the public policy of protecting witnesses. APC contends on appeal that Reust was never actually hired. We view the evidence in the light most favorable to Reust as the party who prevailed at trial.[1]

In April 1998 APC invited Dan Reust to interview for a project manager position. It had intermittently employed Reust in the past. Reust testified at trial that at the conclusion of the interview with APC manager Todd Pizzuto he was offered the job and was given a "hire packet" to complete. Reust returned the completed packet the next day, and Pizzuto asked him to report to the field the following morning. Reust testified that he believed he had been hired when he returned the hire packet. Pizzuto, however, testified that he never offered Reust a job, did not hire him (and did not have the authority to do so), and did not give him a hire packet.

The evening before Reust was to report to the field he received a telephone message from Pizzuto that instructed him to instead meet with Pizzuto the next day. Reust testified that at that meeting he was informed that he was, in his words, being "let go" due to his participation in previous litigation between APC and another former employee. Reust had testified adversely to APC in a 1997 deposition in litigation brought by Richard Jantz.

Pizzuto testified that he did not "recall" whether he told Reust that the *Jantz* lawsuit was the basis for APC's decision. According to the testimony of Michael Bailey, Pizzuto's superior, it was Bailey who made the adverse decision regarding Reust, and Bailey's decision was based on a conversation Bailey had had with Gary Buchanan in which Buchanan (according to Bailey) stated that Reust was "badmouthing" APC. At trial, however, Buchanan denied making this statement and asserted that he did not even know Reust.

The trial jury found for Reust, finding that he had been hired by APC and that it subsequently terminated him unlawfully. The jury awarded Reust damages of $132,200 for past wage loss, $156,800 for future wage loss, and $100,000 for non-economic losses for "[e]motional [d]istress, [m]ental [a]nguish and [a]nxiety." It also found that Reust was entitled to recover punitive damages.

---

1. *See, e.g., Riddell v. Edwards*, 32 P.3d 4, 8 (Alaska 2001).

Following the second phase of the trial, the jury awarded Reust punitive damages of $4.3 million. After Superior Court Judge Jonathan H. Link permitted the State of Alaska to intervene, Reust moved to have parts of the Alaska tort reform legislation[2] declared unconstitutional. Judge Link denied Reust's motion, reduced the punitive damages award to $500,000 per AS 09.17.020(h), and directed that fifty percent of the award be allocated to the state under AS 09.17.020(j).

APC and Reust appeal.

## III. DISCUSSION

### A. Contract Formation Issues

**1. There was no reversible error in the failure to explicitly instruct the jury that consideration is an element of contract formation.**

The superior court gave the jury the following instruction concerning contract formation:

> In order to find that an employment contract existed between Dan Reust and APC in April of 1998 you must find that each of the following propositions is more likely true than not true: (1) that APC made an offer of employment encompassing the essential terms of employment, (2) that Dan Reust agreed to the essential terms of employment offered by APC and accepted APC's offer of employment, and (3) that both parties intended to be bound by the offer and acceptance.

APC argues that the instruction failed to include the necessary element of consideration.[3] It apparently urges us to reverse the jury's contract formation findings, contending that the jury could not have found that Reust accepted the offer and supplied return consideration because he did not

actually commence work. APC's view is dependent on its conception of at-will employment as a form of unilateral contract. Reust responds that by returning the completed "hire packet" and thereby promising to work for APC, he accepted the offer and provided sufficient consideration; the jury instruction was therefore correct.[4]

We do not need to resolve this instructional dispute because any possible error was harmless. Even if the instruction's failure to explicitly list the element of consideration tainted the jury's finding that APC hired Reust, it would not have affected the jury's preliminary finding that APC had offered Reust a position. Similarly, it would not have affected the jury's finding that APC's decision to terminate (or per APC's view, "not to hire") was motivated by Reust's participation in the *Jantz* litigation. For reasons we discuss in Part III.B.1, such retaliatory conduct violates public policy in Alaska. Therefore, any possible instructional error regarding contract formation would not have affected the finding that APC made Reust an employment offer and then withdrew it for an illegal reason. In effect, APC is relying on the fact Reust never actually started work, a circumstance caused by APC's illegal conduct in preventing him from commencing work.

APC conceded at oral argument on appeal that, under its view, a wrongfully terminated employee fired after one minute on the job would have a claim but the same employee would have no recourse if termination occurred one minute before work was to begin. We fail to see any value in this distinction and note that at least one other court has ruled that public policy violations can sustain an at-will employee's cause of action even if

**2.** Ch. 26, SLA 1997.

**3.** *See, e.g., Childs v. Kalgin Island Lodge,* 779 P.2d 310, 314 (Alaska 1989) ("The formation of an express contract requires an offer encompassing its essential terms, an unequivocal acceptance of the terms by the offeree, consideration and an intent to be bound."); *see also Magill v. Nelbro Packing Co.,* 43 P.3d 140, 142 (Alaska 2001).

"Whether a jury instruction is erroneous is a question of law to which we apply our indepen-

dent judgment." *Era Aviation, Inc. v. Lindfors,* 17 P.3d 40, 43 n. 2 (Alaska 2000).

**4.** *See* RESTATEMENT (SECOND) OF CONTRACTS § 71 (1981) ("To constitute consideration, a performance or a return promise must be bargained for. ... A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.").

work was never actually commenced.[5] Moreover, the contract law principle of prevention supports our conclusion.[6] APC was free to withdraw its at-will employment offer for a legitimate reason but cannot now rely on Reust's lack of performance caused by APC's own illegal conduct as a shield against liability.

Accordingly, APC would still be liable even if it were necessary for Reust to have actually commenced work in order to accept the offer and supply consideration. We therefore perceive no reversible error because APC has not demonstrated that the failure to instruct on the consideration element was prejudicial.

### B. Reust's Claim of Public Policy Violation

APC contends that "[i]f a public policy against witness retaliation is to be adopted in Alaska as a basis for a wrongful discharge tort, it should not extend to those instances where an individual has testified falsely or with a reckless disregard for whether his

testimony is true or false." Before turning to APC's truthfulness argument, we first address whether the State of Alaska has an explicit public policy against witness retaliation.

### 1. Witness retaliation is against the public policy of Alaska.

In *Kinzel v. Discovery Drilling, Inc.*, we recognized that "a retaliatory discharge in violation of an explicit public policy gives rise to a tort as well as a contract claim."[7] We concluded that the State of Alaska has explicit public policies that protect employees who make workers' compensation claims and who serve as whistleblowers.[8]

Several Alaska statutes demonstrate that the state also has an explicit policy of protecting witnesses from retaliation. This protective policy is most clearly stated in AS 11.56.510, which makes it a crime to retaliate against a witness by using force, damaging property, or making threats.[9] Other statutes contain witness protection provisions, includ-

---

5. In *Hackett v. Foodmaker, Inc.*, 69 Mich.App. 591, 245 N.W.2d 140, 140–41 (1976), the plaintiff agreed to move from California to Michigan to become a restaurant manager. The restaurant was not yet open when the plaintiff arrived in Michigan, so he filled in for absent managers in other locations until his restaurant was ready. *Id.* at 141. In the meantime plaintiff became involved in an anti-trust suit against defendant and was then informed that anyone involved in such a lawsuit would not be considered for a restaurant manager position. *Id.* Another person was later selected to fill the plaintiff's expected position. *Id.*

The *Hackett* court ruled that these circumstances amounted to a "distinguishing feature" and an exception to the "proposition that contracts for personal services for permanent employment or for life are considered indefinite hirings, terminable at the will of either party." *Id.* The court allowed the claim to proceed because the "plaintiff was never afforded an opportunity to perform under the contract due to defendant's total repudiation thereof in that defendant never allowed plaintiff an opportunity to manage [the restaurant]." *Id.*

Later Michigan decisions addressing *Hackett* have advanced conflicting views over what factors the *Hackett* court found dispositive, but none has criticized its conclusion that a public policy violation can permit a cause of action before performance has commenced. *See Cunningham v. 4–D Tool Co.*, 182 Mich.App. 99, 451 N.W.2d 514, 515–516 (1989); *Filcek v. Norris–Schmid,*

*Inc.*, 156 Mich.App. 80, 401 N.W.2d 318, 319–20 (1986); *Milligan v. Union Corp.*, 87 Mich.App. 179, 274 N.W.2d 10, 12 n. 3 (1978).

6. *See, e.g., Indus. Uranium Co. v. United States*, 180 Ct.Cl. 50, 376 F.2d 868, 872 (1967) ("The defendant [who] prevented performance of the alleged condition[] cannot now stand on it as a bar to recovery."); *Motel Serv., Inc. v. Cent. Maine Power Co.*, 394 A.2d 786, 788 (Me.1978) ("Where the offeree of a unilateral contract is prevented from completing performance by the actions of the offeror, such failure will not be a defense to an action by the offeree on the contract."); *Cahoon v. Cahoon*, 641 P.2d 140, 144 (Utah 1982) ("One party cannot by willful act or omission make it impossible or difficult for the other to perform and then invoke the other's nonperformance as a defense."); RICHARD A. LORD, WILLISTON ON CONTRACTS § 39:3, at 519 (4th ed.2000).

7. *Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 432 (Alaska 2004).

8. *Id.* at 438.

9. AS 11.56.510 provides, in part:

(a) A person commits the crime of interference with official proceedings if the person (1) uses force on anyone, damages the property of anyone, or threatens anyone with intent to (A) improperly influence a witness or otherwise

ing the Alaska Occupational Safety and Health Act,[10] the Alaska Human Rights Law,[11] and the Alaska Assisted Living Homes Act.[12] Through these laws, the state has clearly stated a public policy of protecting witnesses from retaliation. Even though APC's alleged conduct probably does not violate the letter of any of these laws,[13] its actions are contrary to the policy reflected in the statutes. Thus, we hold that there is an actionable public policy tort in Alaska for retaliation against witnesses in legal proceedings.

In reaching this conclusion, we are persuaded by cases from other jurisdictions that have held various forms of witness retaliation to be contrary to public policy.[14] For example, in *Page v. Columbia Natural Resources, Inc.*, the West Virginia Supreme Court held that "it is against substantial public policy of West Virginia to discharge an at-will employee because such employee has given or may be called to give truthful testimony in a legal action." [15] The court found support for this policy in state laws prohibiting "wilful perjury and false swearing[ ] or procuring another to do so" and prohibiting "intimidating or impeding any witness[ ] or attempting to obstruct or impede the administration of justice in any court." [16]

Allowing a tort remedy under these circumstances also furthers the state's interest in maintaining an effective method of judicial dispute resolution. Subjecting employers to tort liability for retaliating against employees who testify in legal proceedings dissuades retaliatory conduct. It also reduces the temptation for employees, fearing adverse responses from their employers, to provide false testimony or disobey a subpoena.[17]

---

influence the testimony of a witness; (B) influence a juror's vote, opinion, decision, or other action as a juror; (C) *retaliate against a witness or juror because of participation by the witness or juror in an official proceeding;* or (D) otherwise affect the outcome of an official proceeding. ... (Emphasis added.)

**10.** AS 18.60.089(a) provides: "A person may not discharge or discriminate against an employee because the employee has ... testified or is expected to testify in a proceeding relating to occupational safety and health...."

**11.** AS 18.80.220(a) provides: "[I]t is unlawful for ... (4) an employer ... to discharge, expel, or otherwise discriminate against a person because the person has ... filed a complaint, testified, or assisted in a proceeding under this chapter...."

**12.** AS 47.33.350(a) provides: "An assisted living home may not take retaliatory action against a resident of that home if the resident or the resident's representative ... (2) appears as a witness, or refuses to appear as a witness, in an adjudicatory proceeding regarding the home...."

**13.** If, for instance, Reust had been fired for testifying in a proceeding under the Alaska Human Rights Act (AHRA), we would be reluctant to recognize a cause of action in this case. The AHRA provides its own cause of action, AS 22.10.020(i), and we have typically declined to recognize independent torts based on contravention of public policy where there are adequate legal alternatives. *See, e.g., Walt v. State,* 751 P.2d 1345, 1353 n. 16 (Alaska 1988) (refusing to recognize independent tort for violation of public policy where statutes and collective bargaining

agreement provided comprehensive scheme for employee rights and remedies).

**14.** *See, e.g., Bishop v. Fed. Intermediate Credit Bank of Wichita,* 908 F.2d 658, 662 (10th Cir. 1990) ("Recognition of the [witness retaliation] exception supports our tradition of free, direct and truthful testimony at legislative hearings, a policy Oklahoma has implicitly recognized."); *Freeman v. McKellar,* 795 F.Supp. 733, 742 (E.D.Pa.1992) (holding that Pennsylvania law "reflect[s] a sufficiently clear and significant public policy" against witness retaliation); *Fitzgerald v. Salsbury Chem., Inc.,* 613 N.W.2d 275, 286 (Iowa 2000) ("[W]e find ample statutory support for a public policy in Iowa in favor of refusing to commit perjury.... [T]his public policy is not simply confined to the refusal to commit perjury but clearly embraces a broader public policy to provide truthful testimony in legal proceedings.") (internal citation omitted); *Ressler v. Humane Soc'y of Grand Forks,* 480 N.W.2d 429, 432 (N.D. 1992) ("[T]he public policy of North Dakota prohibits an employer from discharging an employee for honoring a subpoena and for testifying truthfully."); *Sabo v. Schott,* 70 Ohio St.3d 527, 639 N.E.2d 783 (1994) ("Plaintiff's allegation that he was fired as a result of having testified truthfully, albeit unfavorably to the defendants, if proven to be true, would constitute conduct on the part of the defendants which violates the public policy of this state.").

**15.** *Page v. Columbia Natural Res., Inc.,* 198 W.Va. 378, 480 S.E.2d 817, 826 (1996).

**16.** *Id.* at 825.

**17.** *See* AS 11.56.200 (crime of perjury); AS 09.20.120 ("A witness who disobeys a subpoena

## 2. A "truthfulness" instruction was not required under these facts, and it is unlikely APC preserved the issue for appeal.

■ APC argues that if witness retaliation is contrary to Alaska's public policy, the jury should have been instructed that only "truthful" testimony can be protected.[18] It therefore asserts that the failure to instruct the jury on this requirement is reversible error because it "deprived APC of a critical defense." But, as Reust points out, APC never asserted that it terminated Reust because he testified falsely. In *Page*, the West Virginia Supreme Court addressed this same argument:

> Appellants argue additionally that Plaintiff's Instruction No. 3 failed to require that the testimony be truthful. While the failure to testify truthfully may present an occasion for further instruction in such cases, we find that appellants were not prejudiced by this omission, since there is no allegation that [the plaintiff] was termi-

nated because her testimony was not truthful.[19]

We agree with this reasoning. Because APC did not offer evidence at trial that Reust's alleged lack of truthfulness when he testified in the *Jantz* matter was the reason for his termination, APC was not entitled to such an instruction.

■ We also observe that it is unlikely APC preserved this issue.[20] APC claims that the truthfulness requirement was discussed with the superior court during an unrecorded session that dealt with instructions; it points to circumstances supporting that contention, but it fails to establish where it raised the truthfulness issue on the record.[21] As a result, it is impossible for us to decide whether APC adequately brought the issue to the superior court's attention. Such problems must be avoided by conducting all jury instruction sessions on the record. Our disapproval of off-the-record instructional discussions is long-standing.[22] The lack of a record

served on the witness shall also forfeit to the party requiring the attendance of the witness the sum of $50 and all damages which that party may sustain by the failure of the witness to attend."); Alaska R. Civ. P. 45(f) ("Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued.").

**18.** Jury Instruction No. 26 stated in part: "It is unlawful to fire an employee for giving testimony, including a deposition, in a legal proceeding, or for the possibility that he may have been a witness in the future in the same lawsuit, because this is a violation of a substantial public policy."

**19.** *Page*, 480 S.E.2d at 826 n. 8.

**20.** Alaska Rule of Civil Procedure 51(a) provides in part: "No party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection." APC's appellate counsel was not its trial counsel.

**21.** *See* Alaska R.App. P. 212(c)(8)(B) ("Appellant's brief shall indicate the pages of the record where each point on appeal was raised in the trial court."); *Pope v. State*, 480 P.2d 697, 698 (Alaska 1971) ("[B]asic fairness to all parties to an appeal requires that we limit our review to matters appearing in the record.").

**22.** *See City of Nome v. Ailak*, 570 P.2d 162, 166 n. 4 (Alaska 1977) ("We disapprove of off-the-record discussions between court and counsel concerning jury instructions. Such a practice makes our job needlessly more difficult."); *State v. Abraham*, 566 P.2d 267, 269 (Alaska 1977) (noting that "extensive unrecorded in-chambers conferences ... could have had potentially serious repercussions"); *State v. Buckalew*, 561 P.2d 289, 292 (Alaska 1977) ("The absence of a record presents grave problems when it becomes necessary ... to reconstruct the events that occurred in the court below."); *Ervin v. State*, 761 P.2d 124, 126 n. 2 (Alaska App.1988) (quoting *Ailak*, 570 P.2d at 166 n. 4). We also note that Alaska Administrative Rule 21 provides: "So far as practicable, all judicial business involving the trial of causes and conferences with members of the Bar or litigants shall be on the record and transacted in open court."

*State v. Laraby*, 842 P.2d 1275 (Alaska App. 1992), provides a poignant example of the unnecessary confusion that can result from unrecorded jury instruction sessions. *Laraby* concerned ineffective assistance of counsel; specifically, whether the defense attorney had withdrawn a proposed instruction for tactical reasons. *Id.* at 1279. In a post-conviction evidentiary hearing, the trial judge testified as a witness regarding an off-the-record jury instruction session but "could not recall whether defense counsel had withdrawn any proposed instructions" and "could not explain why the [instruction in question] had not been given." *Id.* at 1277.

prevents or discourages adequate appellate review. It may prevent an appellant from establishing that a meritorious objection was made. And it may also prevent us from understanding precisely what objection was made and the reasoning of the lower court. Because the objections actually made at trial often differ in subtle but material ways from the objections appellants argue on appeal, the lack of a record may also hamper our ability to affirm a judgment. Likewise, the lack of a record of the trial court's reasoning might deny us an opportunity to be persuaded by the court's own words or the circumstances the court relied on in ruling.

### C. Mixed–Motive Instruction

#### 1. The jury instruction on APC's motivation was not reversible error.

■ The jury was instructed that [i]n order to prove his claim for wrongful discharge Dan Reust must prove it more likely true than not true that ... there was a causal connection between Dan Reust having testified, or the fact that he might testify in the future, and the actions APC took. A causal connection is established if the testimony Dan Reust gave was a noteworthy or motivating factor in the decision APC made. It need not have been the only factor or reason.

At trial, APC unsuccessfully requested that the following phrase be added to the last sentence of the instruction: "but the decision would not have occurred without that factor or reason." On appeal, APC argues that it was error not to include the requested phrase. We conclude that APC did not adequately preserve the issue it argues on appeal and that there was no reversible error.

■ Under Alaska law, retaliatory discharge claims can follow different analytical frameworks depending on the type of evidence presented. When there is *no* "direct evidence" of retaliation, a pretext framework is used.[23] Under this analysis, the employee must first establish a prima facie case.[24] If the employee clears this hurdle, the burden of production "shifts to the employer to articulate a legitimate nonretaliatory explanation for the discharge."[25] If the employer does so successfully, the burden reverts to the employee, who must prove that the explanation was a pretext for retaliation.[26]

■ But "[i]n cases where there *is* direct evidence of discrimination, we instead apply a mixed-motive analysis...."[27] Here the plaintiff need only show that a "prohibited reason" was a motivating factor.[28] Then "[t]he employer must show that it would have made the same decision even absent considerations of [the impermissible factor]."[29] Accordingly, if the plaintiff employee presents direct evidence of discrimination or retaliation sufficient to permit an inference that such factors were motivating factors, "the jury should be instructed that if it does draw that inference the plaintiff is entitled to recover unless the *employer* has established by a preponderance of the evidence that the employer would have taken the same action without consideration of the impermissible factor."[30]

---

23. *VECO, Inc. v. Rosebrock,* 970 P.2d 906, 918–19 (Alaska 1999). Direct evidence is "evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit a factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision...." *Kinzel v. Discovery Drilling, Inc.,* 93 P.3d 427, 435 (Alaska 2004) (quoting *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182–83 (2d Cir. 1992)).

24. To establish a prima facie case of retaliatory discharge, "a plaintiff must show: (1) that [the employee] was engaged in a protected activity; (2) that an adverse employment decision was made; and (3) that there was a causal connec-tion between the two." *Kinzel,* 93 P.3d at 433 (quoting *VECO,* 970 P.2d at 921).

25. *Kinzel,* 93 P.3d at 433.

26. *Id.*

27. *Era Aviation, Inc. v. Lindfors,* 17 P.3d 40, 44 (Alaska 2000) (emphasis added).

28. *Kinzel,* 93 P.3d at 434.

29. *Lindfors,* 17 P.3d at 44 (citing *VECO,* 970 P.2d at 920).

30. *Kinzel,* 93 P.3d at 435 (quoting *Ostrowski,* 968 F.2d at 182–83) (emphasis added).

The jury instruction in this case can best be described as a partial mixed-motive instruction. It correctly stated that Reust was required to show that an impermissible factor (i.e., his act of testifying in *Jantz*) was a motivating factor for APC's conduct; however, the instruction failed to inform the jury that Reust should not prevail if APC established that it would have made the same decision without consideration of the impermissible factor. APC recognized that something was missing from the instruction, but its requested language ("but that decision would not have occurred without that factor or reason") would have misapplied the burden. It would have required *Reust* to prove that his participation as a witness in *Jantz* was a determinative factor. As we noted above, an employee who has presented direct evidence of retaliation does not have this burden under the mixed-motive framework. There was direct evidence of an improper motive here. Reust testified that Pizzuto, an APC manager, informed him that APC's decision was due to Reust's involvement in the *Jantz* lawsuit.

At trial APC argued that Reust was not entitled to a mixed-motive instruction because he had not pleaded such a theory and because he maintained that APC's decision was based *solely* on his involvement in the *Jantz* lawsuit. Thus, according to APC, Reust was not entitled to a mixed-motive instruction because he had not argued in the alternative that his prior testimony was merely a "motivating factor." But the mixed-motive framework applies if "the evidence is sufficient to allow a trier to find both forbidden and permissible motives";[31] this threshold is satisfied if the plaintiff introduces direct evidence of an impermissible factor. It does not require the plaintiff to plead that the defendant's conduct was based on a combination of factors instead of a single impermissible factor.[32]

APC might have asserted that there was insufficient direct evidence to warrant a mixed-motive instruction. Had that argument not succeeded, APC should have asked that the instruction include additional language that would also have made it clear that APC had the burden of showing that it would have made the same decision based on legitimate reasons standing alone. But APC did not request such language, and the language it proposed would have erroneously shifted the burden back to Reust. Given Reust's repeated and correct observations that it was APC's burden to show that a legitimate reason alone would have produced the same decision, APC was on notice that the instructional change it sought contained a grave flaw.

A party arguing instructional error must demonstrate that the grounds were properly raised.[33] To the extent APC objected to giving a mixed-motive instruction instead of a pretext instruction, we conclude that no error occurred. To the extent APC objected to the incompleteness of the mixed-motive instruction, we conclude that APC did not distinctly raise this issue at trial. Its failure to offer proposed language that would have correctly allocated the burden of proof means that APC did not provide the superior court with an "identifiable opportunity to rule" on the issue it now raises.[34] We therefore review the instruction "only for plain error which occurs if a correct instruction would have likely altered the result."[35]

Although it is conceivable the jury might have reached a different result had a complete mixed-motive instruction been given, we cannot conclude that a different result would have been likely. For instance, if we assume that the jury disbelieved the testimony of Gary Buchanan *and* accepted APC's "badmouthing" rationale, had a proper in-

---

**31.** *Ostrowski,* 968 F.2d at 181.

**32.** *See, e.g., VECO,* 970 P.2d at 920 (rejecting defendant's "argument that the plaintiff must choose between pursuing a mixed-motive theory and a pretext theory").

**33.** *See* Alaska R. Civ. P. 51(a), quoted in *supra* note 20.

**34.** *Manes v. Coats,* 941 P.2d 120, 125 n. 4 (Alaska 1997) (quoting *Conam Alaska v. Bell Lavalin,* 842 P.2d 148, 153 (Alaska 1992)).

**35.** *Id.* at 125 (quoting *Conam Alaska,* 842 P.2d at 153) (internal quotation marks omitted).

struction been given, the jury *might* have found that the "badmouthing" would have produced the same decision even absent Reust's participation in the *Jantz* lawsuit. But this scenario requires too much speculation about the jury's findings for us to conclude that a correct instruction would likely have altered the result.

### D. Lost Wages Awards

#### 1. The likely period of employment could not reasonably have exceeded three years.

■ The jury awarded past wage loss for nearly three years—from the date APC wrongfully terminated Reust in April 1998 to the beginning of the trial on January 2, 2001. The jury also found that "the length of Dan Reust's future wage loss" was seven years. The jury thus awarded Reust lost wages for a total of about ten years. APC argues that a wage-loss award for a ten-year period was excessive, speculative, and not supported by the record.

■ Viewed, as it must be, in the light most favorable to Reust,[36] the trial evidence nonetheless does not support a conclusion that Reust would have worked for APC continuously for ten years. APC manager Mike Bailey testified that APC project managers typically work one to three years. There was evidence that employment tenure in the construction industry is uncertain; a witness, when asked how long he would have been in a certain job, testified that there was "no telling with construction work." Moreover, Reust's own employment history, including previous stints with APC, undermines the likelihood of a ten-year tenure. Reust testified that he worked for APC on "several different occasions" and his resume indicates that APC employed him at Prudhoe Bay from 1992 to 1995 and at Milne Point from 1995 to 1996.

Reust points to the testimony of Todd Pizzuto, another APC manager, who testified that Reust's position was not project-specific. This suggests that Reust could have been assigned to other projects once his initial assignment was finished. But Pizzuto also testified that that Reust's position could be terminated due to a reduction of force.[37] Reust's counsel suggested in closing argument that Reust would have worked for APC until retirement in 2014. This amounted to a request for about sixteen years of lost wages. But the jury's award of lost wages for ten years implicitly rejected that claim.

■ We have stated that "[t]he normal rule is that a wrongfully discharged employee is entitled to the total amount of the agreed upon salary for the unexpired term of his employment [contract]...."[38] For example, in *Central Bering Sea Fishermen's Ass'n v. Anderson* (*Anderson I*) we held that a wrongfully discharged employee's "lost earnings should be measured by the amount and duration of the contract that [he or] she expected to have with [the employer]," which

36. "The adequacy of evidence supporting a jury's award is a mixed question of law and fact." *Cent. Bering Sea Fishermen's Ass'n v. Anderson* (*Anderson I*), 54 P.3d 271, 277 (Alaska 2002). "As such, we review the evidence presented in the light most favorable to [the prevailing party] and evaluate de novo the legal question of whether that evidence is specific enough to support the jury's economic damages award." *Id.*

37. Pizzuto testified as follows:

Q. Now, isn't it true, Mr. Pizzuto, that the person who was going to get to fill Mr. Peikert's position—whoever that person would have been—would have had that job as long as you did a good job for the company, subject to reduction in force, a transfer, in quitting, or whatever that person wanted to do?
A. Yeah, when—provided we have the work to justify all the positions.

Q. Right. Subject to reduction in force.
A. Yeah.
Q. But otherwise, they would have that job as long as they do a good job for the company, right?
A. As far as I know.
Q. And that particularly work for the project manager isn't a job—isn't project-specific, is it?
A. No.
Q. Okay. In other words, for that particular job, there was no particular project that needed to be completed, and then after it's completed, the person who had gotten the project manager's job, that job would be over and done with, right?
A. No.

38. *Anderson I*, 54 P.3d at 278 (quoting *Skagway City Sch. Bd. v. Davis*, 543 P.2d 218, 225 (Alaska 1975)).

in that case was one year.[39] In comparison, Reust had an at-will relationship of no specified term. We declined in *Kinzel* to rule "on what the appropriate measure of damages for lost wages would be for the tortious discharge of a whistleblower" because the issue was not fully briefed.[40] We now hold that when an at-will employee is wrongfully discharged, damages are appropriately measured by the likely duration of employment had the wrongful discharge not occurred.[41]

The evidence in this case cannot support a finding of ten years as the likely duration of employment. The record reveals that Reust would have been employed for one to three years had APC's tortious conduct not intervened. Viewing the evidence in the light most favorable to Reust, no reasonable jury could find that the likely duration of employment would have exceeded three years. Therefore, we vacate the jury's lost wages awards and remand for entry of a revised judgment awarding lost wages for a period of three years.

### 2. The superior court did not abuse its discretion by excluding evidence that Reust's position had been eliminated.

APC contends that the superior court abused its discretion by excluding evidence that Reust's position had been eliminated in a corporate reorganization.[42] APC

manager Mike Bailey testified at trial on direct examination by APC that he had been "advised" the very morning he took the witness stand that "the position has been eliminated." After Reust raised a hearsay objection, the superior court conducted a lengthy conference out of the jury's presence. Bailey proffered additional testimony during this session that he had been told by APC's president, in a telephone call that morning, that Reust's position had been eliminated.

APC, asserting here that the superior court excluded the testimony as a sanction for failure to disclose and not because it was hearsay, argues that the superior court "was first required to ascertain whether a continuance would have provided a reasonable alternative to exclusion." We do not need to address this argument because APC's starting premise—that the superior court excluded the disputed testimony to remedy a discovery violation—is incomplete. The superior court ruled the testimony was inadmissible hearsay, stating: "We're going to start with the proposition that that's hearsay, and I'm going to instruct the jury that that testimony is stricken." APC does not challenge this ruling on appeal, nor do we see any indication that such a challenge would have been successful.[43] As a result, we conclude that it was not an abuse of discretion to exclude Bailey's testimony that Reust's position had been eliminated.[44]

---

**39.** *Anderson I*, 54 P.3d at 278.

**40.** *Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 438 (Alaska 2004).

**41.** *See, e.g., Tadsen v. Praegitzer Indus., Inc.*, 136 Or.App. 247, 902 P.2d 586, 590 (1995) ("the period that the plaintiff would likely have been employed by the defendant but for the discrimination . . . . is [ ] the proper ultimate question in claims by at will employees . . . .") (affirmed by *Tadsen v. Praegitzer Indus., Inc.*, 324 Or. 465, 928 P.2d 980 (1996)).

**42.** "We review evidentiary rulings for abuse of discretion." *Zaverl v. Hanley*, 64 P.3d 809, 817 n. 16 (Alaska 2003).

**43.** "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of

the matter asserted." Alaska R. Evid. 801(c). The testimony in question appears to fit this definition, and none of the exclusions or exceptions addressed in Alaska Evidence Rules 801(d), 803, or 804 seems to apply.

**44.** The superior court did exclude, as an apparent sanction, other parts of Bailey's testimony. But the "position-elimination" testimony is the only passage that APC argues on appeal was erroneously excluded; even if the court intended the sanction of exclusion to include the "position-elimination" testimony, the superior court's hearsay ruling was an alternative, independent, and unchallenged basis for exclusion. We " 'may affirm a trial court's exclusion of evidence even though the affirmance is based on a ground not relied upon by the trial court.' " *Korean Air Lines Co., Ltd. v. State*, 779 P.2d 333, 339–40 (Alaska 1989) (quoting *Sloan v. Atlantic Richfield Co.*, 541 P.2d 717, 722 n. 6 (Alaska 1975)).

**3. APC has waived any argument that Reust's lost wages should be reduced due to "after-acquired" evidence.**

APC argues in a footnote in its reply brief that it learned for the first time at trial that Reust had provided "reckless" testimony in the *Jantz* lawsuit. APC suggests that this "after-acquired evidence" would have caused APC to terminate Reust for legitimate reasons and therefore that his damages "arguably" should be limited to the date of the trial.[45] APC has waived this argument by first presenting it in its reply brief.[46]

**E. Emotional Distress Damages**

**1. APC did not preserve its challenge to the emotional distress damages award.**

■ The jury awarded Reust $100,000 in emotional distress damages. On appeal APC argues that this award was improper because Reust did not demonstrate that he suffered severe emotional distress. APC waived this argument by failing to assert it below:[47] "As

a general rule, this court will not consider arguments attacking a judgment for the first time on appeal."[48]

**2. Emotional distress damages were not preempted by the exclusive remedy provision of the Alaska Workers' Compensation Act.**

■ APC argues that Reust's claim for emotional distress damages was preempted by the Alaska Workers' Compensation Act. This contention is without merit.[49] Alaska Statute 23.30.055[50] "establishes that an employer's workers' compensation liability, which the employer must pay irrespective of fault, 'is the exclusive remedy for an employee injured during the course of employment.' "[51] But we have held that the "socially beneficial purpose of the work[ers'] compensation law would not be furthered by allowing a person who commits an intentional tort to use the compensation law as a shield against liability."[52] Likewise, it would be nonsensical to allow an employer to rely on the exclusive remedy section, AS 23.30.055, to preclude damages stemming from a public

**45.** APC cites *Brogdon v. City of Klawock*, 930 P.2d 989, 992 (Alaska 1997), which states that

[i]f an employer discovers grave misconduct on the part of a terminated employee which the employee might have been able to conceal had the employee not been terminated, the employer should nonetheless not be required to reinstate the employee or to pay prospective damages for the employee's termination. . . .

**46.** *See Crittell v. Bingo*, 83 P.3d 532, 536 n. 19 (Alaska 2004) (stating that reply brief " 'may raise no contentions not previously raised in either the appellant's or appellee's briefs' ") (quoting Alaska R.App. P. 212(c)(3)).

**47.** APC's briefs fail to specify where in the record this point was raised below. *See* Alaska R.App. P. 212(c)(8)(B). Our review of the record reveals that at trial APC objected to Reust's emotional distress damages claim on the ground it violated the Civil Rule 26 disclosure rule. During a discussion on jury instructions, APC stated, "we still believe that . . . emotional distress is improper," but specified no grounds for its objection. APC did not raise the issue of severity in its directed verdict motion. There is no indication APC brought to the trial court's attention any asserted deficiency in Reust's proof of the severity of his distress.

**48.** *See Koller v. Reft*, 71 P.3d 800, 804 n. 6 (Alaska 2003) (quoting *Mapco Express, Inc. v.*

*Faulk*, 24 P.3d 531, 540 n. 29 (Alaska 2001)) (quotation marks omitted).

**49.** We review questions of law using our independent judgment. *Indus. Commercial Elec., Inc. v. McLees*, 101 P.3d 593, 597 (Alaska 2004). An Alaska statute is interpreted "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters." *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999); *see also Fyffe v. Wright*, 93 P.3d 444, 457 n. 39 (Alaska 2004).

**50.** AS 23.30.055 provides in part:

The liability of an employer prescribed in AS 23.30.045 is exclusive and in place of all other liability of the employer and any fellow employee to the employee, the employee's legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from the employer or fellow employee at law or in admiralty on account of the injury or death. . . .

**51.** *Gunter v. Kathy–O–Estates*, 87 P.3d 65, 70 (Alaska 2004) (quoting *Fenner v. Municipality of Anchorage*, 53 P.3d 573, 575 (Alaska 2002)).

**52.** *Fenner*, 53 P.3d at 575 (quoting *Elliott v. Brown*, 569 P.2d 1323, 1327 (Alaska 1977)) (internal quotation marks omitted).

policy violation.[53] APC has directed us to no statutory text or legislative history suggesting that the Alaska Workers' Compensation Act was intended to provide a remedy for a discharge motivated by a violation of public policy.

## F. Punitive Damages

### 1. The superior court did not err in denying APC's motion for directed verdict on the issue of punitive damages.

APC contends that punitive damages should not have been awarded "because APC's conduct was not shown by clear and convincing evidence to have been outrageous or reckless...."[54] It argues that "Reust's claim that he has been the victim of witness retaliation is very thinly supported at best and any proof by him of this does not rise to the level of clear and convincing evidence." And even if Reust proved that APC "reacted to his deposition testimony," APC asserts that its conduct was not malicious or reckless because "[a] company's conduct in not wanting in its management an individual who falsely accused another of its managers of lying cannot be said to be outside limits of reasonable business conduct."

We have stated that "although a plaintiff may have enough evidence to support the underlying cause of action by a preponderance of the evidence, the plaintiff is required to further establish outrageous conduct on the part of the defendant by clear and convincing evidence before punitive damages are justified."[55] Thus, it does not matter that Reust might have failed to prove witness retaliation by clear and convincing evidence, because that standard of proof applies to proving the outrageousness of APC's conduct, not to proving the underlying tort. APC's second contention—that any witness retaliation was reasonable because Reust allegedly provided untruthful testimony in his *Jantz* deposition—has no theoretical relevance here: APC produced no evidence at trial to support a claim that it terminated Reust because he had testified falsely. APC has not convinced us that we "must intervene to prevent a miscarriage of justice,"[56] and we therefore affirm the superior court's denial of APC's motion for a directed verdict on the issue of punitive damages.

### 2. The punitive damages cap and allocation statutes are constitutional.

Reust challenges AS 09.17.020(f) and (j) on various constitutional grounds.[57] Subsection .020(f) is one of the punitive damages caps and subsection .020(j) is the allocation provision of the 1997 Alaska tort reform legislation.[58]

#### a. Due process

Reust contends that applying the tort reform legislation to his case violated the

---

**53.** See, e.g., Accardi v. Superior Court, 17 Cal. App.4th 341, 21 Cal.Rptr.2d 292, 298 (1993) (stating that "a claim for emotional and psychological damage, arising out of employment, is not barred [by an exclusive remedy provision] where the distress is engendered by an employer's illegal discriminatory practices").

**54.** AS 09.17.020(b) provides: "The fact finder may make an award of punitive damages only if the plaintiff proves by clear and convincing evidence that the defendant's conduct (1) was outrageous, including acts done with malice or bad motives; or (2) evidenced reckless indifference to the interest of another person." See also Robles v. Shoreside Petroleum, Inc., 29 P.3d 838, 846 (Alaska 2001) (quoting Chizmar v. Mackie, 896 P.2d 196, 210 (Alaska 1995)).

**55.** Nelson v. Progressive Corp., 976 P.2d 859, 864–65 (Alaska 1999).

**56.** Great Divide Ins. Co. v. Carpenter ex rel. Reed, 79 P.3d 599, 615 (Alaska 2003) (Matthews, J.,

concurring) (stating that "[w]e will reverse a punitive damages award only if we have a firm conviction based on the record as a whole that the trial court erred and we must intervene to prevent a miscarriage of justice") (internal quotation marks omitted) (quoting State Farm Mut. Auto. Ins. Co. v. Weiford, 831 P.2d 1264, 1266 (Alaska 1992)); see also Alaskan Vill., Inc. v. Smalley, 720 P.2d 945, 948 (Alaska 1986).

**57.** Constitutional issues are issues of law and subject to de novo review. State v. Alaska Civil Liberties Union, 978 P.2d 597, 603 (Alaska 1999).

**58.** Ch. 26, SLA 1997. AS 09.17.020(f)-(h) imposes various caps on punitive damages awards. We discuss the cap applicable to this case in Part III.F.3. AS 09.17.020(j) requires that fifty percent of a punitive damages award be deposited in the state's general fund. Reust describes this as a "forfeiture" provision.

due process clauses of the state and federal constitutions. He asserts that the tort reform legislation applies only to tort causes of action and that, because his claim is for breach of contract, applying the punitive damages cap to his award was arbitrary and irrational. APC responds, correctly, that a plain reading of AS 09.17.020 indicates that it applies to all actions in which punitive damages are awarded.[59] And, as APC notes, Alaska law does not permit punitive damages for breach of contract, except when "the conduct constituting the breach is also a tort for which punitive damages are recoverable."[60] This means that Reust's punitive damages award lies in tort, which would place it within the ambit of the tort reform legislation even if the legislation did not apply to punitive damages stemming from breach of contract claims.[61] We are therefore unconvinced by Reust's "arbitrariness and irrationality" argument.

 Reust also claims that the statutes capping punitive damages awards and requiring payment of fifty percent of such awards to the state violate due process because they infringe on fundamental rights without a compelling or legitimate purpose. He points out that the United States Supreme Court has treated punitive damages as quasi-criminal.[62] According to Reust, retribution is a legitimate justification for awarding punitive damages between private parties, but it is not a legitimate purpose for Alaska's penal administration. The award here, Reust claims, contains inseparable components for retribution and deterrence. Because the state has no interest in retribution, Reust concludes that it cannot have an interest in his punitive damages award.

In *Evans ex rel. Kutch v. State* we concluded that because interests in "unlimited [punitive] damages are merely economic, the State's objectives need only be 'legitimate'— not 'compelling'—to justify the State's action."[63] We then concluded that the state's objectives in establishing the punitive damages caps were legitimate.[64] Those objectives are independent of any "quasi-criminal nature" of punitive damages,[65] and Reust does not challenge the objectives as illegitimate. Accordingly, Reust's claim that the punitive damages caps lack a compelling or legitimate purpose fails.

This court was evenly divided in *Anderson v. State ex rel. Central Bering Sea Fisher-*

**59.** The tort reform legislation applies to *"an action* in which a claim of punitive damages is presented to the fact finder...." AS 09.17.020(a) (emphasis added).

**60.** *McKibben v. Mohawk Oil Co., Ltd.,* 667 P.2d 1223, 1232 (Alaska 1983) (citing RESTATEMENT (SECOND) OF CONTRACTS § 355 (1981)).

**61.** *See ARCO Alaska, Inc. v. Akers,* 753 P.2d 1150, 1154 (Alaska 1988) (stating that "[w]here a party's conduct in breaching a contract rises to the level of a traditionally recognized tort, such as intentional infliction of emotional distress, an action in tort would lie").

**62.** *See Cooper Indus., Inc. v. Leatherman Tool, Inc.,* 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).

**63.** *Evans ex rel. Kutch v. State,* 56 P.3d 1046, 1053 (Alaska 2002) (citing *Reid v. Williams,* 964 P.2d 453, 458 (Alaska 1998)). Chief Justice Fabe, joined by Justice Eastaugh, wrote the court's dispositional opinion. Justices Bryner and Carpeneti dissented in part. The four justices participating in *Evans* were evenly divided on two issues: "the constitutionality of the Tort Reform act's cap on noneconomic damages and its requirement that half of punitive damages awards

be paid to the State...." *Id.* at 1070 n. 140. On these two issues, the *Evans* dispositional opinion affirmed the superior court's ruling but did not create precedent. *See Hammond v. State, Dep't of Transp. & Pub. Facilities,* 107 P.3d 871, 883 n. 7 (Alaska 2005) ("A decision by an evenly divided court results in an affirmance. The opinion agreeing with the result reached by the superior court is referred to as the dispositional opinion, but it does not have the precedential effect of an opinion of the court."). On all other issues present in *Evans* "at least three justices agree[d]; therefore, the court's decision on these issues does have precedential value and is binding on future cases." *Evans,* 56 P.3d at 1070 n. 140.

**64.** *Evans,* 56 P.3d at 1053.

**65.** The objectives include "(1) discourag[ing] frivolous litigation and decreas[ing] the costs of litigation; (2) stop[ping] excessive punitive damages awards in order to foster a positive business environment; (3) control[ling] the increase of liability insurance rates; (4) encourag[ing] self-reliance and independence by underscoring the need for personal responsibility; and (5) reduc[ing] the cost of malpractice insurance for professionals." *Evans,* 56 P.3d at 1053 (citing ch. 26, § 1(1–5), SLA 1997) (citations and internal quotation marks omitted).

*men's Ass'n (Anderson II)* [66] regarding the constitutionality of AS 09.17.020(j), the statute that allocates fifty percent of punitive damages awards to the state. The court's dispositional opinion discusses the reasons why we now hold that AS 09.17.020(j) does not violate substantive due process:

> [A]llocating half of all punitive damage awards to the state will reduce the incentive for plaintiffs to pursue punitive damages claims. The statute will also encourage plaintiffs to settle their cases since the state only shares in punitive damages when an award is made. These incentives could reduce both the overall number of punitive damage claims as well as the number of punitive damage claims that actually go to trial. This effect could reasonably be expected to have a moderating influence on liability insurance premiums. Further, the incentive to settle punitive damage claims could reduce the length and complexity of litigation, thereby reducing the overall cost of litigation. The state's expectation that AS 09.17.020(j) will help to fulfill these purposes is at least minimally rational.[67]

The dispositional opinion in *Anderson II* also concluded that "[i]ncreasing state revenues by allocating a portion of punitive damages awards to the state based on the analogy between such awards and civil and criminal fines is a legitimate public policy choice." [68] Dissenting in part, Justice Bryner, joined by Justice Carpeneti, argued that the allocation statute was not minimally rational because "the only way that subsection (j) discourages punitive damages claims is by punishing any claimant who files a meritorious claim, successfully pursues it to completion, and receives a factually accurate and lawfully authorized judgment." [69] We do not share this view. It is rational to

expect that fewer punitive damages claims will be filed and that more will be settled if the potential payoff is capped or reduced by allocating half of any punitive damages awards to the state. Justice Bryner's partial dissent also argued that "[j]ust as cost savings alone do not sustain otherwise arbitrary state action, so revenue earning is not, in itself, a legitimate legislative purpose." [70] But in our view, the state action is not arbitrary here because the objectives of punitive damages are analogous to the objectives of civil and criminal fines. The decision to increase state revenues by allocating a portion of punitive damages awards to the state is therefore legitimate. We hold that AS 09.17.020(j) does not violate substantive due process for the reasons expressed in the dispositional opinion in *Anderson II*.

### b. Equal protection

Reust argues that the punitive damages caps violate the equal protection clauses of the Alaska and United States Constitutions. He claims that the tort reform legislation discriminates between two classes of litigants—those who receive full recovery and those whose recovery is capped. This exact argument was presented and rejected in *Evans*.[71]

### c. Right to jury trial

Reust argues that the punitive damages cap violates the right to a jury trial provided by the Alaska Constitution.[72] This argument was rejected in *Evans*, where a majority of this court agreed that "[t]he decision to place a cap on [punitive] damages awarded is a policy choice and not a re-examination of the factual question of damages determined by the jury." [73] Reust urges a reconsideration of this conclusion, arguing that "[a] constitu-

---

**66.** *Anderson v. State ex rel. Cent. Bering Sea Fishermen's Ass'n (Anderson II)*, 78 P.3d 710 (Alaska 2003). Justice Matthews, joined by Justice Eastaugh, authored the dispositional opinion regarding the constitutionality of AS 09.17.020(j); Justices Bryner and Carpeneti dissented in part.

**67.** *Id.* at 717 (internal footnote omitted).

**68.** *Id.* at 718.

**69.** *Id.* at 724 (Bryner, J., dissenting in part).

**70.** *Anderson II*, 78 P.3d at 724 (Bryner, J., dissenting in part).

**71.** The dispositional opinion rejected the argument that the punitive damages caps violate equal protection. *Evans*, 56 P.3d at 1051–55.

**72.** Alaska Const. art. I, § 16.

**73.** *Evans*, 56 P.3d at 1051.

tional protection cannot be bypassed by allowing it to exist in form but not letting it have an effect in function." We see no compelling reason to revisit *Evans's* holding on this issue.

### d. Takings

██ Reust claims that the allocation requirement in AS 09.17.020(j) is a taking because it deprives him of a property right in his punitive damages claim.[74] We addressed this issue most recently in *Anderson II*.[75] The dispositional opinion concluded that AS 09.17.020(j) does not violate the takings clauses of the Alaska Constitution or the Federal Constitution.[76] The opinion gave two reasons. First, it determined that Anderson's claim for punitive damages was only protected property insofar as permitted by AS 09.17.020(j).[77] Anderson's unlitigated claim only became property when it accrued, and a claim cannot accrue before the events that give rise to it occur.[78] Because Anderson's claim accrued after the August 7, 1997 effective date of AS 09.17.020(j), the scope of her claim was defined by existing state law.[79] Thus, AS 09.10.020(j) limited her claim—and therefore her property right—to one-half of any punitive damages award.[80]

Second, the dispositional opinion pointed to Anderson's reasonable expectations when her claim accrued.[81] It stated that because Anderson's reasonable expectations were controlled by the law in effect when her claim accrued and subsection .020(j) was then in effect, she could not reasonably expect to recover more than half of her punitive damages award.[82] We are persuaded by these arguments and apply them to Reust, whose claim accrued in April 1998, after AS 09.17.020(j) became effective.

Reust's brief cites the Colorado Supreme Court's decision in *Kirk v. Denver Publishing Co.* in support of his argument that AS 09.17.020(j) effects an unconstitutional taking.[83] The court held in *Kirk* that a Colorado punitive damages allocation statute was a taking because it applied after a final judgment was entered in the plaintiff's case and after the judgment was collected from the defendant.[84] The property interest in the punitive damages award therefore vested before a portion was taken by the state.[85] The dispositional opinion in *Evans* distinguished *Kirk* on the ground that the Colorado statute, unlike AS 09.17.020(j), applied after a final judgment was entered in the plaintiff's case.[86] In *Anderson II*, the dispositional opinion also disagreed with " 'the implicit conclusion in *Kirk* that a plaintiff has a greater property interest in a judgment upon a tort claim than the interest recognized by law when the claim accrued.' "[87] Most other

---

**74.** Reust also asserts that subsection .020(j) is void on its face because it requires attorneys to perform services without just compensation. There is no need to address this argument because we have previously held that AS 09.60.080 requires that the superior court deduct pro rata the contingent fee from the state's portion of the punitive damages award. *Anderson II*, 78 P.3d at 720–22.

**75.** *Anderson II*, 78 P.3d at 714–16. We previously addressed the issue in *Evans*, 56 P.3d at 1058. The dispositional opinion in *Evans* concluded that the statute does not effect a taking because the statute limits a plaintiff's property interest in punitive damages before it vests. *Id.* The dispositional opinion noted that "[t]his construction of AS 09.17.020(j) is consistent with the legislature's power to limit or abolish punitive damages...." *Id.*

**76.** *Anderson II*, 78 P.3d at 714–15.

**77.** *Id.*

**78.** *Id.* at 714.

**79.** *Id.* at 714–15.

**80.** *Id.* at 715.

**81.** *Id.* (citing *State, Dep't of Natural Res. v. Arctic Slope Reg'l Corp.*, 834 P.2d 134 (Alaska 1991) (recognizing importance of reasonable expectations in constitutional takings claims); *Beluga Mining Co. v. State, Dep't of Natural Res.*, 973 P.2d 570, 576 (Alaska 1999) (same)).

**82.** *Anderson II*, 78 P.3d at 715.

**83.** *Kirk v. Denver Publ'g Co.*, 818 P.2d 262 (Colo. 1991).

**84.** *Id.* at 272–73.

**85.** *Id.* at 268.

**86.** *Evans*, 56 P.3d at 1058 n. 74.

**87.** *Anderson II*, 78 P.3d at 716 n. 30 (quoting *DeMendoza v. Huffman*, 334 Or. 425, 51 P.3d

state supreme courts have upheld against takings challenges statutes that allocate some part of punitive damages awards to governmental entities.[88]

In his partial dissent in *Anderson II*, Justice Bryner, joined by Justice Carpeneti, argued that AS 09.17.020(j) "neither redefines nor regulates the permissible scope of unlitigated punitive damages claims; instead, subsection .020(j) attempts to alter the plaintiff's property rights only after the plaintiff's claim accrues and is fully litigated, after the claim proves successful, and after the plaintiff 're-ceives an award.' "[89] Justice Bryner pointed to statutory language that specifies the source of forfeiture as " 'the award' " that " 'a person receives' " and that is available for deposit into the general fund of the state.[90] But the intent of the legislature was clearly to allocate a portion of punitive damages awards to the state.[91] Insofar as the *Anderson II* dispositional opinion's construction of the statutory language avoids a constitutional violation by redefining the permissible scope of unlitigated punitive damages claims, we now adopt that construction.[92] We therefore hold that AS 09.17.020(j) does not result in an unconstitutional taking.

### 3. The superior court applied the incorrect statutory cap.

Reust argues that if a punitive damages cap applies, the superior court should

have applied AS 09.17.020(f), rather than AS 09.17.020(h). He is correct.

The superior court reduced the punitive damages award to $500,000 per AS 09.17.020(h), which lists increasing cap levels that depend on the employer's number of employees.[93] That subsection applies to "an action against an employer to recover damages for an unlawful employment practice prohibited by AS 18.80.220," which proscribes various forms of employment discrimination. Reust argues that his action does not fall under AS 18.80.220; rather, it is a claim for retaliatory wrongful discharge. Therefore, if any punitive damages cap were applicable, Reust claims it should have been the cap imposed by AS 09.17.020(f). That subsection states that, "[e]xcept as provided in (g) and (h) of this section, an award of punitive damages may not exceed the greater of (1) three times the amount of compensatory damages awarded to the plaintiff in the action; or (2) the sum of $500,000."

APC argues that because Alaska did not recognize a wrongful discharge tort when the tort reform legislation was enacted, the trial court correctly applied AS 09.17.020(h). According to APC, AS 18.80.220 provided the only known cause of action for awarding punitive damages in the context of employment termination, so "the legislature could well have concluded that it had adequately

---

1232, 1234 (2002) (quoting *Fust v. Attorney Gen.*, 947 S.W.2d 424, 431 (Mo.1997))).

88. *See, e.g., Gordon v. State*, 608 So.2d 800, 801–02 (Fla.1992); *Mack Trucks, Inc. v. Conkle*, 263 Ga. 539, 436 S.E.2d 635, 639 (1993); *Cheatham v. Pohle*, 789 N.E.2d 467, 472–75 (Ind.2003); *Shepherd Components, Inc. v. Brice Petrides–Donohue & Assocs., Inc.*, 473 N.W.2d 612, 619 (Iowa 1991); *Fust v. Attorney Gen.*, 947 S.W.2d 424, 431 (Mo.1997); *Rhyne v. K–Mart Corp.*, 358 N.C. 160, 594 S.E.2d 1, 14–15 (2004); *DeMendoza*, 51 P.3d at 1245–47.

89. *Anderson II*, 78 P.3d at 723 (Bryner, J., dissenting in part) (original emphasis) (quoting AS 09.17.020(j)).

90. *Id.* at 723 n. 4 (Bryner, J., dissenting in part) (quoting *Evans*, 56 P.3d at 1077).

91. *Id.* at 717–18.

92. *See Chenega Corp. v. Exxon Corp.*, 991 P.2d 769, 785 (Alaska 1999) (construing statute so as to avoid constitutional problems where reasonable to do so); *see also Bonjour v. Bonjour*, 592 P.2d 1233, 1237 (Alaska 1979); *Larson v. State*, 564 P.2d 365, 372 (Alaska 1977); *Hoffman v. State*, 404 P.2d 644, 646 (Alaska 1965).

93. AS 09.17.020(h) states:

Notwithstanding any other provision of law, in an action against an employer to recover damages for an unlawful employment practice prohibited by AS 18.80.220, the amount of punitive damages awarded by the court or jury may not exceed (1) $200,000 if the employer has less than 100 employees in this state; (2) $300,000 if the employer has 100 or more but less than 200 employees in this state; (3) $400,000 if the employer has 200 or more but less than 500 employees in this state; and (4) $500,000 if the employer has 500 or more employees in this state.

described the cap for termination torts by the manner in which the subsection (h) cap was drafted."

Alaska Statute 09.17.020(h) limits punitive damages recoveries in AS 18.80.220 discrimination cases, but does not purport to limit awards for all types of torts arising from an improper termination. For example, APC concedes that AS 09.17.020(h) does not address torts such as intentional infliction of emotional distress or defamation that may arise from a non-discriminatory termination. APC cites no legislative history suggesting that the legislature intended AS 09.17.020(h) to have a broader application beyond awards in discrimination cases arising under AS 18.80.220. Because we conclude that AS 09.17.020(h) does not apply here, we remand for application of AS 09.17.020(f).

Once the correct punitive damages award has been determined under the statutory cap, it will also be necessary for the superior court to ensure that the award is not excessive per the statutory factors listed in AS 09.17.020(c) [94] and the three "guideposts" outlined by the United States Supreme Court.[95]

**94.** *See Cent. Bering Sea Fishermen's Ass'n v. Anderson (Anderson I )*, 54 P.3d 271, 282 (Alaska 2002).

**95.** *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418–21, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (applying *Gore* factors); *Anderson I*, 54 P.3d at 284 (same).

**96.** "A lower court's decision on a motion to intervene is reviewed for an abuse of discretion." *Mundt v. Northwest Explorations, Inc.*, 947 P.2d 827, 829 (Alaska 1997).

Intervention as a matter of right is appropriate when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
Alaska R. Civ. P. 24(a).
Permissive intervention is appropriate "when an applicant's claim or defense and the main action have a question of law or fact in common" and
[w]hen a party to an action relies for ground of claim or defense upon any statute or execu-

## G. The Superior Court Did Not Abuse Its Discretion in Allowing the State of Alaska To Intervene.

▬▬▬▬▬ Reust argues that the superior court should not have allowed the State of Alaska to intervene either as a matter of right or permissively.[96] The state responds that intervention was appropriate for both reasons and, even if it were not, it was entitled to intervene under Alaska Rule of Civil Procedure 24(c) because Reust challenged the constitutionality of a state statute.[97] We agree that Rule 24(c) justifies the state's intervention.[98]

In addition, it appears that the state should always be permitted to intervene when there is any dispute about how a punitive damages award is to be allocated. Other recent cases have presented equivalent disputes, such as whether pro rata attorney's fees and costs should be deducted from the state's allocation.[99] Indeed, we have a difficult time imagining how the state could be denied intervention in such cases.

tive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action.
Alaska R. Civ. P. 24(b).

**97.** Alaska Civil Rule 24(c) states, in part:

When the constitutionality of a state statute affecting the public interest is drawn in question in any action to which the state or an officer, agency, or employee thereof is not a party, the court shall notify the Attorney General of Alaska of such fact, and the state shall be permitted to intervene in the action.

**98.** Although Reust filed his motion challenging the constitutionality of AS 09.17.020 after the superior court granted the state's motion to intervene, Reust's challenge had the effect of rendering any possible error by the superior court harmless. The constitutional challenge would have permitted intervention even if the superior court had denied it previously.

**99.** *See, e.g., Anderson v. State ex rel. Cent. Bering Sea Fishermen's Ass'n (Anderson II )*, 78 P.3d 710, 720–22 (Alaska 2003).

### H. The Timing of the Entry of Judgment Was Appropriate.

 Reust argues that the superior court unfairly delayed entry of judgment, causing a lower interest rate to apply to his award. The jury returned its first verdict on January 11, 2001 and then awarded punitive damages by supplemental verdict of April 24, 2001. But the superior court did not sign the interim final judgment until June 11, 2002.

APC correctly points out that disputed post-verdict motions were pending before the superior court until the interim final judgment was entered on June 11, 2002. For example, on March 1, 2002 Reust submitted a motion asking the court to declare unconstitutional the tort reform statute. In addition, some of the delay was due to Reust's own request to hold matters in abeyance pending mediation between the parties. The superior court was therefore justified in delaying entry of judgment.

## IV. CONCLUSION

For these reasons, we REMAND for reduction of the lost wages awards in accordance with this opinion, for application of the punitive damages cap set out in AS 09.17.020(f), and for review of the recalculated punitive damages award for excessiveness. We AFFIRM the remainder of the superior court's rulings variously challenged by APC or Reust.

BRYNER, Chief Justice, with whom CARPENETI, Justice, joins, dissenting in part.

BRYNER, Chief Justice, with whom CARPENETI, Justice, joins, dissenting, in part.

I disagree with the court's decision to uphold Alaska's punitive damages forfeiture statute. For the most part, I rely on the reasons set out in my dissenting opinions in *Anderson II*[1] and *Evans v. State;*[2] but I add one comment below to address a point regarding punitive damages forfeiture that is newly raised in today's opinion.

The opinion suggests that the punitive damages forfeiture law can be sustained as minimally rational because it is similar to a fine: "the objectives of punitive damages," the court declares, "are analogous to the objectives of civil and criminal fines."[3] Of course, fines and punitive damages undoubtedly do have the same general purpose. But beyond its reliance on this truism, the court's proposed analogy between fines and forfeiture breaks down and becomes unconvincing: After all, unlike the punitive damages forfeiture provision, our justice system does not require the victim to prosecute the offender; nor does it force the prosecutor to pay the fine. So while the punitive damages forfeiture statute nominally serves the same purpose as a fine, it hardly advances this purpose in a rational manner.

---

1. *Anderson v. State ex rel. Central Bering Sea Fishermen's Ass'n,* 78 P.3d 710, 723–24 (Alaska 2003) (*Anderson II*).

2. *Evans ex rel. Kutch v. State,* 56 P.3d 1046, 1075–76 (Alaska 2002).

